# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

EDGENET, INC.,

        Plaintiff,

    v.                                   Case No. 09-CV-65

GS1 AISBL, GS1 U.S., INC., 1SYNC, INC., and
AMERICAN HARDWARE MANUFACTURERS
ASSOCIATION,

        Defendants.

---

## ORDER

This case involves a host of claims made by a business against a competitor, as well as related standards-setting bodies and business leagues. In an effort to make something stick, plaintiff Edgenet, Inc., appears to have taken the kitchen-sink approach in its Second Amended Complaint (Docket #43). Plaintiff has alleged seemingly every claim it can imagine: monopolization, racketeering, conspiracy, copyright infringement, misappropriation of trade secrets, consumer fraud, common law misappropriation, and unjust enrichment. In response, defendants GS1 U.S., Inc. ("GS1 U.S.") and 1SYNC, Inc. ("1SYNC") have filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Docket #56), supported by a brief (Docket #57) that fights fire with fire by offering up its own kitchen-sink approach. Defendants American Hardware Manufacturers Association ("AHMA") and GS1 AISBL join in the motion (Docket #'s 58, 59). The brief challenges nearly every aspect of every claim, leaving the court to determine to what extent this action

will proceed, if at all. In conformance with the analysis below, the court will grant in part and deny in part defendants' motion to dismiss, allowing Counts VI and VII, the copyright infringement and misappropriation of trade secrets claims, to survive.

## FACTUAL BACKGROUND

In order to set the stage, the court will first outline the facts alleged in the complaint. Plaintiff is an information technology company that, among other things, operates "data pools" that aggregate, organize, and deliver data for clients. (Second Am. Compl. ¶ 3). A data pool acts as a central repository, allowing trading partners to share product data. *See id.* at ¶ 19. As the operator, plaintiff contracts with retailers as well as suppliers. *Id.* Plaintiff builds and maintains data pools for retailers containing data related to products they sell. *Id.* Additionally, suppliers also provide product data to plaintiff. *Id.* Retailers may then subscribe to particular suppliers' data pools, operated by plaintiff, and have that product data added to the retailer's data pool, also operated by plaintiff. *Id.* In order to standardize product data, many entities participate in the Global Data Synchronisation Network ("GDSN"). *Id.* at ¶ 18. The GDSN synchronizes product data between interconnected data pools. Data Synchronisation (GDSN), GS1, http://www.gs1.org/gdsn/ds (last visited Sept. 13, 2010). The GDSN works by: (1) a seller registering product and company information in a data pool; (2) a portion of that data is sent to a global registry; (3) the buyer subscribes to receive a seller's product information through its own data pool; and (4) the seller's data pool shares the information with the

buyer's data pool.  How Does GDSN Work, GS1, http://www.gs1.org/gdsn/ds/how (last visited Sept. 13, 2010); *see also* (Second Am. Compl. ¶ 19).  Defendant GS1 AISBL controls the GDSN and the certification process that data pool operators such as plaintiff must undergo in order to operate a "GS1-GDSN certified" data pool.  *Id.* at ¶ 18, 20.  GS1 AISBL also controls the Global Standards Management Process ("GSMP") used to develop product description standards for use in the GDSN.  *Id.* at ¶ 20.  In order to participate in the GDSN, a company must obtain a GS1-assigned "company prefix."  *Id.* at ¶ 21.  For a U.S. business to obtain a company prefix, it must do so through defendant GS1 U.S., which is an independent member organization of GS1 AISBL, but also allegedly the "U.S. arm" of GS1 AISBL.  *Id.* at ¶¶ 6, 10, 21.

In the dispute at hand, plaintiff specifically aggregates, categorizes, and serves up what it terms "basic supply-chain data," such as product measurements, as well as "marketing data," which may include images or certain product-specific information.  *Id.* at ¶ 3.  Supply-chain data is standardized through the GDSN, whereas marketing data is essentially proprietary.  *Id.* at ¶¶ 26-27.  Collectively, the court will refer to the combination of supply-chain and marketing data as "product data."  In order to provide marketing data, plaintiff developed the "Collection Taxonomy and Attributes" ("Master Collection") to aggregate, organize, and distribute product data.  *Id.* at ¶ 26.  The Master Collection consists of a "collection taxonomy," which is a system of organization that places products into a variety of

categories and sub-categories, as well as "attributes" that detail various properties of a product. *Id.* In addition to cataloguing product properties, the attributes also include questions that plaintiff asks to collect the data, whether such questions are mandatory or optional, and the format of potential answers. *Id.* at ¶¶ 26-29. The Master Collection is the subject of federal copyright registration. *Id.* at ¶ 26, 32.

Defendant 1SYNC is a wholly-owned subsidiary of defendant GS1 U.S., and operates data pool services accounting for approximately 85% of GS1-registered products in the United States. *Id.* at ¶¶ 6, 11, 22. Both GS1 U.S. and 1SYNC are currently tax-exempt non-profit organizations under 26 U.S.C. § 501(c)(6). *Id.* at ¶¶ 4, 22, 40, 41, 43. In the past, 1SYNC has focused on collecting and delivering only supply-chain data, whereas plaintiff invested in developing data pools and systems to collect and deliver marketing data in addition to GDSN supply-chain data. *Id.* at ¶¶ 23-25. According to plaintiff, because of its innovative provision of marketing data, defendants GS1 AISBL, GS1 U.S., and 1SYNC began to see plaintiff as a threat and so set about to eliminate competition from plaintiff in a number of ways. *Id.* at ¶ 39. First, plaintiff alleges that GS1 U.S. and 1SYNC have falsely represented themselves as non-profit business leagues to the U.S. Internal Revenue Service ("IRS"). *Id.* at ¶¶ 41-53. As a result, plaintiff alleges that GS1 U.S. and 1SYNC have abused their tax-exempt status to maintain a monopoly over the data pool market. *Id.* at ¶¶ 54-61. GS1 U.S. and 1SYNC allegedly initiated a project intended to develop marketing data to add to the GDSN in an attempt to eliminate

competition from other data pool providers that provide proprietary solutions, such as plaintiff. *Id.* at ¶¶ 55-59. Plaintiff alleges that GS1 U.S. and 1SYNC then set about effectuating this plan by engaging in exclusionary conduct, including the issuing of a press release stating their ability to satisfy the attribute needs of Home Depot, which had recently switched to plaintiff, through the GDSN. *Id.* at ¶ 60. According to plaintiff, this statement was false. *Id.* at ¶ 61.

Next, plaintiff alleges that GS1 U.S. and 1SYNC abused their control over a standard-setting initiative to add the Master Collection to the GDSN. *Id.* at ¶ 62-63. Around November 2006, defendants GS1 U.S., 1SYNC and AHMA began the Hardlines & Electronics Attribute Initiative ("HEAI") in order to add marketing data to the GDSN. *Id.* at ¶ 64. The HEAI is allegedly intended to maintain monopoly power over the data pool market. *Id.* at ¶ 65. The process sought to develop marketing attributes to then be reviewed and approved by industry before implementation in the GDSN. *Id.* at ¶ 67. The project was slow to implement its first round of attributes – it took nearly fourteen months to develop marketing data for washing machines alone. *Id.* at ¶¶ 68-72. As a result, the defendants moved to shift the standard-setting process from AHMA control to a smaller, GS1-controlled group with less industry participation. *Id.* at ¶¶ 75-76.

What appears to be the heart of plaintiff's complaint, however, occurred in 2008 when GS1 U.S., 1SYNC and AHMA allegedly received a spreadsheet or series of spreadsheets ("Spreadsheet") containing taxonomy categories and marketing

attributes for a number of products. *Id.* at ¶ 77. The Spreadsheet is allegedly derived from the Master Collection. *Id.* GS1 U.S. then allegedly took the Spreadsheet and created a derivative work which was used to expedite addition of taxonomy categories and marketing attributes to the GDSN. *Id.* at ¶¶ 78-95. During this process of expedited addition, GS1 U.S., 1SYNC and AHMA allegedly made false representations regarding participation in the standard-setting process in order to conceal the source of the new standards, as well as to induce standard-setting participants to vote in favor of accepting new standards. *Id.* at ¶¶ 80, 83-88. Further, the process also resulted in GS1 AISBL, GS1 U.S. and 1SYNC causing AHMA to publish communications and documents containing copyrighted material to the GS1 website. *Id.* at ¶¶ 84-90, 93.

Finally, plaintiff alleges that GS1 AISBL, GS1 U.S., and 1SYNC continue to: falsely represent the source of the new marketing data; threaten to continue to misuse plaintiff's proprietary information; and that GS1 U.S. and 1SYNC continue to misrepresent and abuse their tax-exempt status. *Id.* at ¶¶ 101-07.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asserts that the plaintiff has failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In order to survive the motion, the complaint must allege sufficient facts to state a "plausible" claim to relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While

"labels and conclusions" and "a formulaic recitation of the elements" are insufficient, the complaint need only "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put differently, plausibility requires only that a court be able to "infer more than the mere possibility of misconduct." *Iqbal*, 129 S. Ct. at 1950. Facts that raise a "reasonable expectation that discovery will reveal evidence" suffice. *Twombly*, 550 U.S. at 556. The court reads the complaint in the light most favorable to the plaintiff, accepts all well-pleaded facts as true, and draws all possible inferences in favor of the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Factual allegations are presumed true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. Legal conclusions are not entitled to this assumption of truth, but may provide a framework within which to work. *Iqbal*, 129 S. Ct. at 1950.

## ANALYSIS

On the basis of the facts alleged, plaintiff sets out ten separate claims against the defendants. Against GS1 U.S. and 1SYNC, plaintiff alleges monopolization under federal and Wisconsin law, a civil claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), civil conspiracy under RICO, violation of the Wisconsin Organized Crime Control Act ("WOCCA"), copyright infringement, misappropriation of trade secrets under Wisconsin law, violation of the New Jersey Consumer Fraud Act, common law misappropriation, and common law unjust enrichment. *Id.* at ¶¶ 115-218. Plaintiff asserts claims for civil RICO conspiracy,

copyright infringement, misappropriation of trade secrets, common law misappropriation, and unjust enrichment against GS1 AISBL. *Id.* at ¶¶ 155-63, 176-98, 204-18. Finally, plaintiff asserts copyright infringement and misappropriation of trade secrets against AHMA. *Id.* at ¶¶ 176-98.

With the benefit of the analysis detailed below, the court finds that plaintiff has failed to state a claim as to monopolization, RICO, RICO conspiracy, WOCCA, the New Jersey Consumer Fraud Act, common law misappropriation, and common law unjust enrichment. Plaintiff's claims for copyright infringement and misappropriation of trade secrets survive to fight another day, however.

## I.    STANDING[1]

At the outset of both the supporting and reply briefs, defendants make numerous challenges to plaintiff's allegations of injury. Though defendants later make some individual standing challenges, the court interprets these initial challenges to injury as questioning whether plaintiff has sufficiently plead standing for each claim. In order to have standing to bring suit, a plaintiff must show: injury in fact that is concrete and particularized, as well as actual or imminent; a causal connection between the injury and the defendant's conduct; and a likelihood the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). These elements must be established "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

---

[1]Because of the determination that Counts III, IV, V, VIII, IX, and X fail to state a claim irregardless, the court need not address standing as regards those claims.

### A. Monopolization Under Section 2 of the Sherman Act

Plaintiff's first count alleges improper maintenance of a monopoly under Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants ostensibly make three arguments against plaintiff's standing. Defendants first argue that plaintiff has failed to allege plausible damage and thus has not shown injury. Second, defendants argue plaintiff has not shown a causal link between GS1 U.S. and 1SYNC's conduct and the injury. Third, defendants argue plaintiff has not sufficiently shown "antitrust injury." Each argument is discussed in turn.

#### 1. Showing Injury

As plaintiff correctly notes, and defendants concede, there is no requirement that a plaintiff prove the facts alleged in a complaint. To require otherwise would ignore the command to treat all well-pleaded facts as true. Here, plaintiff has in fact alleged lost profits and reduced income. (Second Am. Compl. ¶ 112). Defendants refer to such allegations as "summary conclusions" (Defs.' Br. in Supp. 5), arguing plaintiff has not alleged "non-conclusory" facts (Defs.' Reply Br. 3). However,

*Twombly* and *Iqbal* only prohibit giving credence to legal conclusions.[2]  Further, plaintiff has in fact alleged damages in excess of 50 million dollars.  (Second Am. Compl. ¶ 110).  The only relevant question is whether these allegations give rise to a plausible claim of injury.  Assuming the 50 million dollar sum to be true, the plaintiff would clearly be concretely and particularly injured.  Thus, plaintiff has sufficiently shown plausible injury.

### 2. Showing a Causal Link

Here again, defendants argue that plaintiff's factual allegations are too conclusory to support the plausible existence of causation.  However, it is entirely plausible that, assuming defendants took and made use of plaintiff's proprietary information, *id.* at ¶¶ 77-95, that it resulted in some form of lost profits, reduced income, or some portion of the 50 million dollar sum.  Taken as true, this proprietary information provided plaintiff with a competitive advantage, the loss of which could plausibly lead to a loss of customers and thus a loss of profits and reduced income if a competitor was then able to provide the same services.  Accepting the allegation

---

[2]In fact, it could be said that all facts alleged in a complaint are inherently conclusory because they are, as yet, unsupported by evidence.  As the Seventh Circuit has noted, "treating the allegations of the complaint as a statement of the party's *proof* leads to windy complaints and defeats the function of [FRCP] Rule 8."  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).  This remains true, though less forceful, even in light of instruction that district courts handle antitrust complaints more cautiously due to potentially higher expense.  *Twombly*, 550 U.S. at 558.  It is further worth noting that the warning expressed in *Twombly*, and pointed to by defendants, was not that all antitrust complaints require more specificity because of potential expense, but that where a particular antitrust case has the potential to be expensive, it may be subject to "some specificity."  *Id.*  The *Twombly* Court found such potential in that case where the plaintiffs represented a putative class of 90% or more of phone and internet service subscribers in the continental United States against the country's largest telecommunications firms.

that defendants are generally able to provide data pool services at lower costs, causation is particularly plausible. *Id.* at ¶ 120. The actual measure of such damages, and the accuracy of the 50 million dollar sum are not appropriate considerations at this stage of litigation. Thus, plaintiff has sufficiently shown plausible causation.

### 3. Showing Antitrust Injury

More forcefully, defendants argue that plaintiff has not sufficiently alleged a specific "antitrust injury" necessary to carry forward an action under the Sherman Act. As the U.S. Supreme Court has stated, antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Congress wrote antitrust laws for "the protection of competition, not competitors." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006). The Supreme Court noted that proof of lessened competition is not always necessary, pointing to short-term effects of some anti-competitive behavior, such as predatory pricing which initially stimulates price competition. 429 U.S. at 489 n.14. However, it remains true that an antitrust injury must show loss from acts reducing output or raising consumer prices. *Stamatkis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).

The Seventh Circuit has indicated that the requested relief may often serve as "an important clue to the soundness of the antitrust claim." *Brunswick Corp. v.*

*Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir. 1984). There, in affirming the dismissal of antitrust claims, the court noted that the plaintiff's request to transfer ownership of a patent involved a desire to make as much money as possible from the patent – a request in which the court could find no benefit for the consumer. *Id.*

This court reads plaintiff's complaint to allege that: defendants GS1 U.S. and 1SYNC instituted "Operation Anaconda" in order to restrain competition; misused proprietary information by incorporating it into GDSN standards to be shared with participating entities; abused the HEAI standards-setting process; and abused their tax-exempt statuses, all in order to restrain competition. (Second Am. Compl. ¶¶ 39-40, 55-60, 62-65, 74, 77-79, 84-85, 94, 101-02, 108, 119-21, 123). Further, plaintiff specifically alleges that GS1 U.S. and 1SYNC's conduct has injured consumers by means of "reduced competition, reduced innovation, and reduced consumer choice" and that there is a "dangerous probability" defendants will control consumer prices long-term. *Id.* at ¶ 124.

The existence of Operation Anaconda, without more, cannot establish plausible antitrust injury. Plaintiff's allegations of intent to develop marketing attributes in order to "squelch" competition, *id.* at ¶ 55, are no more than hidden legal conclusions as to defendants' "anticompetitive" behavior within the meaning of antitrust injury. Stripped of legal conclusions, an internal agreement to develop marketing attributes is equally consistent with a legal business strategy to better compete by matching a competitor's product. Attempts to reduce competition

through further competition within the market (i.e., out-competing a competitor) are not the type of injury antitrust laws were intended to prevent.

The misuse of proprietary information in the HEAI standards-setting process also fails to establish plausible antitrust injury. While such misuse may be independently unlawful, the mere addition of marketing attributes to standards shared with all GDSN-certified data pool operators is not itself anti-competitive within the meaning of antitrust laws. There is no showing of reduced output or raised consumer prices. Because these standards are intended to be used by all, the addition of plaintiff's marketing attributes would serve only to increase competition, as consumers will now have greater choice in data pool operators if they wish to use marketing attributes. Neither are there facts showing long-term negative effects. Such misuse of information made available to all competitors is insufficient to establish plausible antitrust injury.

The only way either Operation Anaconda or the misuse of proprietary information might form an antitrust injury is in conjunction with defendants' alleged abuse of tax-exempt status. Abuse of tax-exempt status could plausibly allow an organization to set prices at an anti-competitive level. However, "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990). Predatory pricing requires that prices are "below an appropriate measure of its rival's costs" and there is "a dangerous

probability" of the rival recouping the loss.  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993).  As explained by the Seventh Circuit, predatory pricing has three stages in which low prices are set, producers who cannot make a profit exit, and monopoly prices ensue.  *Wallace v. Int'l Bus. Machs. Corp.*, 467 F.3d 1104, 1106 (7th Cir. 2006).  Without exit, or where recoupment is improbable even with some producers exiting, there is no antitrust injury.  *Id.*  Thus, abuse of tax-exempt status could allow defendants to more easily engage in predatory pricing.  However, even accepting plaintiff's allegations of intent to muscle out for-profit data pool providers, the complaint contains no allegations indicating that any for-profit data pool providers would in fact be forced to exit the market, let alone that defendants would then be able to recoup their losses.[3]  In fact, the allegations indicate that for-profit companies can compete despite the improper tax-exempt status.  *See* Second Am. Compl. ¶ 6 (claiming 15% of the market held by five for-profit operators).  There are no allegations that any for-profit operator was losing market share before the advent of marketing data innovations.  At most, plaintiff appears to allege only that it will have lost its competitive advantage.  Thus, the alleged abuse of tax-exempt status is insufficient to establish plausible antitrust injury.

---

[3]Plaintiff does allege a "dangerous probability" that defendants will control prices long-term (Second Am. Compl. ¶124), but fails to allege actual recoupment of losses, or any other facts allowing such an inference.

Finally, plaintiff's explicit allegations of reduced competition, reduced innovation, reduced consumer choice, and lack of lower prices are also insufficient to establish plausible antitrust injury. Alleging reduced competition is little more than a hidden legal conclusion alleging anti-competitive conduct.[4] Alleging that lower prices will not occur is not the same as plausibly claiming that consumer prices will be raised. Alleging reduced innovation as a result of defendants' conduct does not create an inference of raised consumer prices or reduced output.[5] Finally, alleging reduced consumer choice might allow an inference of raised consumer prices, however, plaintiff appears to have plead itself out of such a claim. Rather than being faced with less consumer choice, the alleged misuse of plaintiff's proprietary information and incorporation into GDSN standards will increase the choice of data pool operators who can offer those sorts of marketing attributes. Therefore, plaintiff has failed to show plausible antitrust injury and consequently failed to state a plausible claim for monopolization under the Sherman Act.

## B. Copyright Infringement and Misappropriation of Trade Secrets

As to defendants' charge that plaintiff lacks standing to bring the copyright claim, it essentially relies on the same brief arguments of failure to plead actual harm

---

[4]Reduced competition is not coextensive with anti-competitive conduct anyway. *See infra* note 5.

[5]Though innovation may well spring from competition, the purpose of antitrust laws is not to prevent monopolies, but to prevent anti-competitive conduct that may result in a monopoly. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system.").

and a causal link. (Defs.' Br. in Supp. 5-7). Defendants cite one case specific to copyright infringement for the proposition that a plaintiff must show financial loss or the infringer's profits in order to obtain compensatory damages. *In re Aimster Copyright Litig.*, 334 F.3d 643, 649 (7th Cir. 2003). This is accurate. It is also the case that statutory damages or an injunction may be had without showing financial loss. *Id.* The question is simpler than that, however. Under the Copyright Act, the "legal or beneficial owner of an exclusive right under a copyright" may bring an action for infringement. 17 U.S.C. § 501(b). Plaintiff is alleged to own the copyright and thus satisfies standing under the Act. As to constitutional standing, by defendants' alleged copying and use of the copyright, plaintiff has lost some measure of its value by losing competitive (and potentially pricing) advantage. This is a concrete and particular injury. It is also imminent based on plaintiff's allegations of looming inclusion in GDSN standards. Further, as alleged, plaintiff's injury is the result of defendants' copying. Thus, a causal link is alleged to exist as well. Therefore, plaintiffs allege sufficient facts to show the plausible existence of standing to bring the copyright claim.

This analysis is equally applicable to the trade secrets claim under Wisconsin law. The information alleged to be a trade secret is essentially the same as the copyright material. *E.g.,* Second Am. Compl. ¶ 190. Thus, the injury and causation analysis apply in the same manner and plaintiff has sufficiently shown facts establishing the plausible existence of standing as regards the trade secrets claim.

## II.   RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

Plaintiff has alleged that defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), specifically Section 1962(c).  Defendants argue that plaintiff lacks standing to include as predicate acts the alleged tax fraud and false statements, and that plaintiff has failed to sufficiently plead a pattern of racketeering activity.  Section 1962(c) states that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (2006).  A claim under this section of RICO must sufficiently allege:  "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).  An enterprise is any individual or legal entity, or union or group of individuals associated in fact. 18 U.S.C. § 1961(4).  A "pattern of racketeering activity" requires at least two predicate acts of racketeering within a ten-year period.  18 U.S.C. § 1961(5); *Jennings*, 495 F.3d at 472.  "Racketeering activity" is exhaustively defined in RICO section 1961(1).  *Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000).  Predicate acts include mail fraud, wire fraud, and criminal copyright infringement.  18 U.S.C. § 1961(1).

Plaintiff alleges mail and wire fraud related to sending false tax returns ("Tax Fraud Acts"), wire fraud through misrepresentations made to induce industry participants to approve defendants' proposed standards ("HEAI Acts"), mail and wire fraud related to GS1 U.S. and 1SYNC falsely holding themselves out as nonprofit organizations ("False Nonprofit Acts"), and mail and wire fraud through misrepresentation of their data pool capabilities ("False Capability Acts"). (Second Am. Compl. ¶¶ 11, 60, 80, 83-92, 103-07, 145-47). Plaintiff also alleges the predicate act of criminal copyright infringement. *Id.* at ¶¶ 78, 84-95, 149-51. The court rejects defendants' argument as to standing for predicate acts, but nonetheless finds that plaintiff has not sufficiently pled the pattern element.

## A.    Standing Related to Predicate Acts

Defendants argue that plaintiff has failed to sufficiently show causation between the alleged predicate acts of tax fraud and false statements and the complained-of injuries. (Defs.' Br. in Supp. 18-20); (Defs.' Reply Br. 11-12). They suggest that because the causality between the acts and injury is too remote, those predicate acts may not be considered for the purpose of determining whether a pattern exists. Plaintiff responds, however, that the injury may arise from any predicate act within the pattern and, once such injury is established, a predicate act allegedly within the pattern may only be ignored if it does not satisfy the relatedness prong of the "continuity plus relationship" test. (Pl.'s Br. in Opp'n 23-24). Plaintiff has the right of it here.

A plaintiff need not suffer injury from each predicate act necessary to state a RICO violation. *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir. 1987). "Imposing such a requirement . . . would conflate what must be two separate inquiries: first, was there a pattern of racketeering activity violating RICO, and second, was the plaintiff injured by the RICO violation?" *Id.* Here, the cases defendants cite are more properly understood as finding that causation between the alleged RICO violations (the pattern as a whole) and the claimed injuries were too remote.[6] Rather, defendants' real argument is more appropriately directed toward whether the alleged predicate acts are related enough to constitute part of the alleged pattern. *See id.* ("At what targets the acts of racketeering activity are aimed goes to the question whether a 'pattern' has been demonstrated.").[7] Thus, because there is no requirement that each alleged predicate act exhibit independent proximate cause of the claimed RICO injury, the alleged tax fraud and false statements may be considered in the pattern inquiry to follow.

---

[6]Defendants cite to three cases in this regard. In *Anza v. Ideal Steel Supply Corp.*, the Supreme Court did in fact find the causal link lacking between the defendant's tax fraud and the plaintiff's loss of sales. 547 U.S. 451, 458-59 (2006). However, the Court specifically indicated that it was the alleged "RICO violation" as a whole, described as the "asserted *pattern* of fraud" that failed proximate cause. *Id.* at 458 (emphasis added). In *Anza*, the entire alleged violation was a tax fraud scheme. *Id.* at 453-55. The same can be said for defendants' other two citations. *See Hemi Grp., LLC v. City of New York, N.Y.*, 130 S. Ct. 983, 989-94 (2010) (conduct as a whole subject to proximate cause inquiry); *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 403 (7th Cir. 2006) ("pattern of fraud"). Were the entirety of defendants' alleged pattern based solely on tax fraud, this case might then be indistinguishable from the cited cases. It is not.

[7]Defendants do indeed argue lack of relationship, and the court discusses such arguments to the extent necessary below.

**B.     Showing a "Pattern" Requisite for a RICO Violation**

However, plaintiff's allegations do not sufficiently show a plausible pattern claim because of a lack of continuity. Courts apply the "continuity plus relationship test" to determine satisfaction of the pattern element. *Jennings*, 495 F.3d at 473. The test requires the predicate acts be related and pose a threat of continued criminal activity. *Id.* Continuity may be closed- or open-ended. *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). Closed-ended continuity exists where related predicate acts take place over a "substantial period of time." *Id.* at 242. Open-ended continuity exists where, even despite a short duration, there is a demonstrable threat of continuity. *Id.* This demonstration may occur by "specific threat of repetition extending indefinitely into the future," or by showing the predicates "are part of an ongoing entity's regular way of doing business." *Id.* The Seventh Circuit offers the following "*Morgan* factors" to assess in determining continuity: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Jennings*, 495 F.3d at 473 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)). As regards the number and variety of acts, "mail and wire fraud allegations are unique among predicate acts because multiplicity of such acts may be no indication of the requisite continuity of the underlying fraudulent activity." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1024-25 (7th Cir. 1992); *see also Talbot v. Robert Matthews Distrib. Co.*, 961

F.2d 654, 663 (7th Cir. 1992) (no pattern where multiple acts of mail fraud only furthered single scheme and had non-distinct injuries). Accordingly, courts should look to whom a defendant directed the mail and wire fraud acts toward, their similarity, and whether the injuries were distinct. *See Midwest Grinding*, 976 F.2d at 1025.[8] The pattern analysis is intended to reach "a natural and commonsense result, consistent with Congress's concern with long-term criminal conduct." 495 F.3d at 473.

### 1. Open-Ended Continuity

Plaintiff's complaint does not show plausible open-ended continuity because there are no allegations of plausible continued threat. At the outset, where plaintiff merely alleges that conduct threatens to continue, *e.g.,* Second Am. Compl. ¶¶ 102, 152, such allegations are legal conclusions under the pattern analysis, and not to be given the assumption of truth under *Iqbal.* Where plaintiff instead alleges the threat of continuity either directly, *e.g., id.* at ¶ 148, or by inference from the predicate acts alleged, *e.g., id.* at ¶ 150, such allegations are tied to the predicate acts and discussed below.

The allegations of a continued threat of copyright infringement are not plausible. Even taken as true that defendants are prepared to put the copyrighted information into GDSN standards, *see* Second Am. Compl. ¶ 102, the injury has

---

[8]The *Midwest Grinding* court found a lack of continuity where hundreds of invoices were directed toward only a few customers and were very similar. 976 F.2d at 1024-25. "The sizable number of mailings [did] not show that the defendants operated a long-term criminal operation." *Id.* at 1025.

already occurred.  The infringement would have occurred when defendants first used the Spreadsheet to create the derivative from which new standards are developed.  Though defendants may not have completed their implementation, doing so remains merely a step within the alleged infringement.  Instead, a threat of continuation might be plausible if plaintiff alleged facts showing defendants were prepared to continue stealing and infringing other copyrighted material from the Master Collection not yet obtained, or perhaps that defendants regularly commit criminal copyright infringement as part of their business.  They have not.  Thus, the complaint has not shown a threat of future copyright infringement.

The complaint also fails to show a plausible threat of future tax fraud.  The Tax Fraud Acts relate only to one overarching tax-fraud injury.  That alleged injury occurred upon the first alleged false filing and has simply become more severe with each subsequent filing.  The successive filings have not created distinct injuries, nor separate tax-fraud schemes.  Skepticism of mail fraud to support closed-ended continuity encourages skepticism of multiple mailings to show future repetition.  Accordingly, the tax-fraud injury remains in existence, but there is no showing it will be  repeated,[9] nor would it satisfy the "regular way of doing business" test because such test implies repetition.[10]  It may be defendants' "regular way of doing business" to annually file forms that maintain tax-exempt status, but it is not alleged that

---

[9]The concept of repetition necessarily implies that the previous occurrence has ended.

[10]Where it is regular to commit an act, it is reasonable to suppose such act will recur in the future.

defendants engage in other distinct acts of tax fraud as part of their business. Therefore, the complaint does not show a threat of future distinct tax fraud.

The complaint also fails to show a plausible threat of future wire fraud related to the HEAI Project. As with the Tax Fraud Acts, all of the alleged HEAI Acts are incident to a single injury: improperly including plaintiff's proprietary information in new GDSN standards. While it may be true that further communications are necessary before the standards are implemented, the result is ultimately one injury as a part of one scheme. There are also a lack of allegations that it is defendants' regular way of doing business to issue wire communications seeking to fraudulently induce approval of standards derived through copyright infringement. The complaint contains no facts sufficient to show that the defendants threaten to commit future acts of wire fraud unrelated to this singular copyright dispute.

Finally, the False Nonprofit Acts and False Capability Acts are not plausible predicate acts and thus cannot be considered in the pattern analysis. Mail and wire fraud require a scheme to defraud, intent to defraud, and use of the mail or wires in furtherance of such. *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006). A scheme to defraud is one to "deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (interpreting mail fraud statute). "To defraud" has a "common understanding of wronging one in his property rights." *Id.* (interpreting mail fraud statute). Additionally, puffery does not constitute fraud. *United States v. Canty*, 499

F.3d 729, 733-34 (7th Cir. 2007) ("puffing" does not give rise to actionable fraud); *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003) (dismissing RICO claim because sales puffery did not constitute mail fraud); *see also Jepson, Inc. v. Makita Corp.*, 43 F.3d 1321, 1330 (7th Cir. 1994) (inherently subjective expressions ill-suited as basis for mail and wire fraud).

Here, the alleged False Nonprofit Acts are not technically false. GS1 U.S. and 1SYNC are in fact technically nonprofits, though their status may have been improperly acquired. *See* Second Am. Compl. ¶¶ 4, 22, 40, 43. Further, the alleged False Capability Acts are no more than puffery. Statements regarding the ability of a business to meet clients' needs are completely subjective. Thus, neither set of alleged predicate acts are plausible and so cannot be considered in the pattern analysis.[11] Therefore, because the complaint fails to show any plausible threat of continuity, it has failed to show plausible open-ended continuity sufficient to establish a RICO pattern.

## 2.    Closed-Ended Continuity

There is no plausible closed-ended continuity here either. While the series of alleged predicates occurred over more than four years, the other *Morgan* factors and common sense counsel against finding closed-ended continuity. The examination

---

[11]The court recognizes that the case *United States v. Green* indicates that mailings need not be fraudulent on their face so long as they are incident to a fraudulent scheme. 786 F.2d 247, 249 (7th Cir. 1986). However, as the Seventh Circuit noted in *Jepson*, where mailings and wire communications are themselves the alleged acts of fraud serving as RICO predicates, they must stand on their own. 34 F.3d at 1330-31. Additionally, as will be discussed below, the two sets of acts likely do not qualify as predicates because schemes to eliminate competition may not form the basis of fraud claims under *Jepson*.

of the number of victims, presence of separate schemes, occurrence of distinct injuries, and number and variety of predicate acts weigh more heavily than the time period, and thus against finding closed-ended continuity.

Even accepting the allegations as true, only plaintiff and the United States are indicated as victims.  The complaint does not show plausible victimization of other market participants.  Defendants' alleged misuse of plaintiff's copyright in fact would benefit the other participants, as discussed previously.[12]  Additionally, the alleged acts of mail and wire fraud cannot serve to create victims through a general scheme to eliminate competition.  The Seventh Circuit has cited approvingly the proposition, and this court agrees, that competitive injury is not the type of harm which may form the basis for mail or wire fraud.  *Jepson*, 34 F.3d at 1327.[13]  Thus, because anticompetitive injury is not a proper basis for mail or wire fraud, other market

---

[12]See the discussion in Section I.C.

[13]In *Jepson*, the Seventh Circuit affirmed dismissal of a civil RICO complaint because defects in the mail and wire fraud allegations left the claim without the necessary predicate acts. 34 F.3d at 1327.  The court "[found], at the outset, considerable persuasive force to the district court's conclusion that the nature of the scheme alleged . . . [was] beyond the scope of the mail and wire fraud statutes" and cited approvingly a 1991 Ninth Circuit case.  *Id.*  The Ninth Circuit first explained that U.S. Supreme Court precedent establishes that the mail fraud statute protects only property rights, though such may be tangible or intangible.  *Lancaster Cmty. Hosp. v. Antelop Valley Hosp. Dist.*, 940 F.2d 397, 405-06 (9th Cir. 1991).  The court then reasoned that the defendant's conduct was aimed at increasing market share at the expense of competitors, and that "[m]arket share is neither tangible or intangible property; its loss is far too amorphous a blow to support a claim of mail fraud."  *Id.* at 406.  Elaborating, it wrote that "it might be said that defendants hoped to 'steal' Lacaster's customers.  But it cannot be said that these customers were Lancaster's property."  *Id.*  Finally, the court explained that "[t]he fraud Lancaster alleges is in reality nothing more or less than unalloyed anticompetitive conduct.  This conduct may be unacceptable, but it is not 'fraud.'" *Id.*  The *Jepson* court declined to explore the issue further because the alleged acts failed in other respects.  *Jepson*, 34 F.3d at 1327.  The court finds such reasoning persuasive.

participants are not properly considered victims for purposes of the *Morgan* factor.[14]

Further, the United States as a victim adds little if any weight to plaintiff's claim. While predicate acts harming only a third party may be considered in analyzing the existence of a pattern, that third party is a much less convincing victim for continuity purposes when the harm is wholly different. Moreover, as just discussed, the Tax Fraud Acts are not to be viewed as creating market-participant victims through a (tenuous) relation to competitive injury. Thus, not only do the Tax Fraud Acts fail to show market participant victims, the United States itself is the victim of an alleged scheme that is unrelated to anything harming plaintiff.[15] Consequently, plaintiff's complaint shows, at best, one victim and one very tenuously related victim, and, as a result, this factor weighs against a finding of closed-ended continuity.

The number of schemes weighs against the claim as well. The predicate acts alleged show, at most, a tax-fraud scheme, an infringement or other

---

[14]The court only assumes a general scheme to eliminate competition for purposes of this analysis, and does not accept such in a manner contradictory to finding a lack of antitrust injury in Section I.C.

[15]The relationship prong of the "continuity plus relationship" test is satisfied where conduct has "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Nw. Bell*, 429 U.S. at 240. To the extent that plaintiff attempts to hang its hat on the Tax Fraud Acts to provide an additional scheme, victim, and distinct injury, the court finds such predicate acts unrelated and thus not capable of supporting a pattern. In one light, the Tax Fraud Acts may be viewed as a scheme to defraud the government, victimizing the United States and creating a distinct injury through loss of tax revenue. However, viewed in this light, it is clear that the acts are not related to the other alleged predicate acts. The Tax Fraud Acts have a different purpose, result, victim, and method of commission. In an alternate light, the Tax Fraud Acts may be viewed as a scheme to reduce competition, victimizing plaintiff and creating a distinct injury through loss of profits, however the court has already rejected this possibility under *Jepson*. However, the court will refrain from making a finding because, even assuming their relatedness, the Tax Fraud Acts do not help plaintiff's claim.

misappropriation scheme, and a scheme to eliminate competition. As discussed earlier, schemes to eliminate competition are not the proper subject of fraud, and the alleged copyright infringement would seem to in fact increase competition. Further, the tax-fraud scheme is tenuously related at best. Thus, there is only a showing of two schemes, one of which carries little weight. Therefore, this factor also counsels against finding closed-ended continuity.

The injury factor does not help plaintiff either. The copyright infringement is a distinct injury. However, the Tax Fraud Acts, as discussed above, create only a tenuously related injury, and the other acts of mail and wire fraud cannot soundly create injuries to competition. Thus, again, there are, at best, two distinct injuries here, one of which is very tenuously related, if at all. This factor, too, works against finding closed-ended continuity.

Finally, the number and variety of predicate acts do not save the claim. There is alleged but one act of copyright infringement. While plaintiff alleges a not insubstantial individual number of mail and wire fraud acts, they are ultimately only subsets of larger acts. The six allegedly fraudulent tax filings constituting mail fraud are in reality only a subset of one continuous alleged improper tax status. The same reasoning applies to the HEAI Acts. The HEAI mail and wire communications are all incident to the same single act of copyright infringement. And, as discussed previously, the alleged False Nonprofit Acts and False Capability Acts do not qualify as predicate acts. In total, the complaint reads as an allegation of copyright

infringement or misappropriation that has been padded with allegations of fraud that are either incident to the dispute, tenuously related, or severe overreaching. Thus, the *Morgan* factors lead the court to find that there is no closed-ended continuity. The length of time over which all the acts occurred is likely sufficient, but not determinative. *See Morgan*, 804 F.2d at 976 (no single factor necessarily determinative). The number and variety of predicate acts are deceptive and do not weigh in favor of finding continuity. There are only two victims, two schemes, and two injuries at best, and the alleged tax fraud is too tenuously related to give much weight to the second victim, scheme, and injury. Therefore, common sense and the *Morgan* factors urge the court to, and it does so, find a lack of closed-ended continuity. Because plaintiff has failed to allege facts sufficient to show continuity, it has failed to state a claim under RICO.

## III.    CIVIL RICO CONSPIRACY

Plaintiff also alleges a violation of RICO conspiracy under § 1962(d). (Second Am. Compl. ¶¶ 155-63). Defendants argue that plaintiff failed to establish the plausible existence of an agreement giving rise to conspiracy, and that the intracorporate conspiracy doctrine operates to bar the claim here. Section 1962(d) of RICO prohibits conspiring to violate any of the other three provisions within § 1962, including subsection (c), as alleged in Count III by plaintiff. 18 U.S.C. § 1962(d); Second Am. Compl. ¶¶ 137-54. In order to commit conspiracy under RICO, "[o]ne must knowingly agree to perform services of a kind which facilitate the

activities of those who are operating the enterprise in an illegal manner." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000). It is unnecessary to show actual commission of predicate acts, nor is it necessary that conspirators agree to actually commit the predicate acts themselves, or even participate, so long as they agree the acts will be committed. *Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 961 (7th Cir. 1996). Thus, to carry the day, plaintiff must allege facts establishing a plausible claim that: (1) defendants agreed to "conduct or participate in the affairs of an enterprise through a pattern of racketeering activity"; and (2) defendants "further agreed that someone would commit at least two predicate acts to accomplish those goals." *See Id.* Because the court finds that plaintiff has failed to establish a plausible claim to conspiracy, the complaint fails to state a claim and it need not address the intracorporate conspiracy doctrine.

Defendants begin by arguing that plaintiff cannot establish a plausible conspiracy if its facts cannot establish a plausible violation. Plaintiff responds that, under *Gagan*, a RICO violation need not be established in order to establish RICO conspiracy. While this is an accurate statement, it does not apply to the issue at hand. While it is true that RICO conspiracy does not require the predicate acts to have actually taken place, the predicate acts that the parties have conspired to effectuate must be sufficient to create a RICO violation. Without such a showing,

it is simply impossible to have a "conspir[acy] to violate" a RICO provision. *See* 18 U.S.C. § 1962(d).

While not binding, the Ninth Circuit has put this point succinctly: where a party "fail[s] to allege the requisite substantive elements of RICO, the conspiracy cause of action cannot stand." *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.8 (9th Cir. 1992). That circuit later explained this point by writing that "if the section 1962(c) claim does not state an action upon which relief could *ever* be granted, regardless of the evidence, then the section 1962(d) claim cannot be entertained." *Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1127 (9th Cir. 1997). It distinguished such a case from one where "[a] lack of evidence may render the substantive claim deficient, but it does not render it legally impossible," thus allowing a conspiracy claim to stand despite a directed verdict on the § 1962(c) claim. *Id.* The *Neibel* case has been disagreed with here in the Seventh Circuit, but on separate grounds (that is, to the extent the Ninth Circuit's opinion disagreed with *Brouwer*). *See United States v. Warneke*, 310 F.3d 542, 547-48 (7th Cir. 2002). However, in its opinion, the Seventh Circuit pointed out that, regarding conspiracy generally, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Id.* at 547 (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). Thus, where plaintiff has failed to sufficiently allege a plausible claim to relief under § 1962(c), such a deficiency infects plaintiff's § 1962(d) claim as well. Because the facts alleged

cannot establish plausible continuity, *see* Section II.B, the complaint does not show a plausible "pattern of racketeering activity." Because, under the facts alleged, the pattern element is legally impossible, a RICO violation is legally impossible, and it is correspondingly impossible to conspire to violate § 1962(c) through acts that would not violate § 1962(c).

Further, there are no additional facts alleged indicating a conspiracy to commit any predicate acts that would in fact create a RICO violation. Therefore, the court finds plaintiff has failed to allege facts sufficient to show a plausible claim to relief under § 1962(d) of RICO.[16]

## IV. WISCONSIN ORGANIZED CRIME CONTROL ACT

Plaintiff advances the same allegations as appear in its claimed RICO violation to support a violation of the Wisconsin Organized Crime Control Act, Wis. Stat. § 946.80, *et seq.* ("WOCCA"). (Second Am. Compl. ¶¶ 164-75). As both parties note, RICO interpretation informs WOCCA interpretation, except where there are express alternative requirements. *Brunswick Corp., Mercury Marine Div. v. E.A. Doyle Mfg. Co.*, 770 F. Supp. 1351, 1363 (E.D. Wis. 1991). As in RICO, WOCCA prohibits conducting or participating in an enterprise "through a pattern of racketeering activity." Wis. Stat. § 946.83(3) (2008). The "continuity plus relationship" test applies when analyzing the existence of a pattern. 770 F. Supp.

---

[16]Because the court finds plaintiff has failed to state a claim for relief under RICO conspiracy, it need not address the question of whether the intracorporate conspiracy doctrine applies.

at 1363. Though WOCCA actually requires a minimum of three predicate acts, Wis. Stat. § 946.82(3), the continuity analysis of plaintiff's alleged predicate acts remains the same. Thus, because the complaint fails to allege facts sufficient to show plausible continuity, and thus fails to sufficiently show a pattern under RICO, the complaint also fails to show plausible continuity and thus pattern under WOCCA. Because plaintiff has failed to allege facts sufficient to show a plausible pattern of racketeering activity, plaintiff has failed to state a plausible claim to relief under WOCCA.

## V.    COPYRIGHT INFRINGEMENT

Plaintiff has also alleged that defendants infringed the copyright in its Big Hammer Master Collection Taxonomy and Attributes 2008 ("Master Collection") pursuant to Title 17, Chapter 5 of the U.S. Code. (Second Am. Compl. ¶¶ 176-88); 17 U.S.C. § 501 *et seq.* Defendants first argue that plaintiff has not stated a claim because the complaint does not allege direct copying from the copyrighted Master Collection, but later recast their argument as a failure to allege substantial similarity. (Defs.' Br. in Supp. 30-31); (Defs.' Reply Br. 18-19). In either case, defendants' arguments fail. Defendants also argue that the copyright in question lacks sufficient originality to be valid and that the merger doctrine bars plaintiff's claim of infringement. (Defs.' Br. in Supp. 31-33).

Proving copyright infringement requires: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *JCW Invs.,*

*Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007). Copying can be shown with direct evidence, or by an inference when there is substantial similarity between the works and the defendant is shown to have had access to the copyrighted work. *Id.* at 915. However, in the case of inferred copying, access may be presumed where the two works are so similar that it is highly probable the later work is a copy. *Id.* In determining this probability, courts look to the degree of similarity, as well as the degree to which the alleged copy is "unlike anything in the public domain." *Id.* Because plaintiff has pled sufficient facts to establish the elements of copyright infringement, and has not pled itself out under the merger doctrine, plaintiff has not failed to state a claim for copyright infringement.

## A. Establishing the Elements of Valid Copyright and Copying

Plaintiff has sufficiently shown both required elements of a copyright claim. Direct copying of a copyrighted work is not necessary to infringe, so long as protected elements are copied. Thus, copying from an unregistered derivative may constitute infringement. This is clear from the Seventh Circuit's formulation of the elements of infringement in *JCW*: "copying of *constituent elements*." 482 F.3d at 914 (emphasis added). Further, while accepted across other circuits,[17] the Seventh

_____

[17] *See, e.g., Montgomery v. Noga*, 168 F.3d 1282, 1292-93 (11th Cir. 1999) (infringement where defendant incorporated unregistered computer code that included 70% of the original, copyrighted code, essential to functioning); *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1112 (1st Cir. 1993) ("Any elements that the author of the derivative work borrowed from the underlying work . . . remain protected by the copyrights of the underlying work."); *Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1979) ("The established doctrine prevents unauthorized copying or other infringing use of the underlying work or any part of that work contained in the derivative product so long as the underlying work itself remains copyrighted.").

Circuit has implicitly recognized this rule. *See Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 519-20 (7th Cir. 1996). In *Harris*, the question concerned whether the plaintiff had forfeited its copyright on architectural plans by publishing an unregistered brochure under the 1976 Copyright Act. *Id.* The court noted that "[i]f the basis of Harris' claim of copyright was that the underlying architectural plans were registered or published with notice, it could prevail." *Id.* at 520. The court cited approvingly a case in which the Fifth Circuit held that copying the reproduction of copyrighted floor plans published in an unregistered brochure constituted infringement. *Id.* (citing *Imperial Homes Corp. v. Lamont*, 458 F.2d 895 (5th Cir. 1972)).

Here, plaintiff alleges that the Master Collection is the subject of copyright registration. (Second Am. Compl. ¶ 177). A certificate of copyright registration provides a *prima facie* presumption of validity. *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). Thus, plaintiff has alleged facts, taken as true, that show the plausible existence of valid copyright.

As to the second element, plaintiff alleges that the Spreadsheet obtained by defendants contained taxonomy categories. (Second Am. Compl. ¶ 77). Plaintiff also alleges that the Master Collection exists to, among other things, "organize" product data, and that the Master Collection is "a hierarchical classification system that [plaintiff] uses to organize products into various categories and sub-categories." *Id.* at ¶ 26. Plaintiff then alleges that defendants created a derivative work from the

Spreadsheet. *Id.* at ¶ 78. Read in the light most favorable to plaintiff, the taxonomy categories allegedly contained in the Spreadsheet may be easily inferred to be the exact same organized category information contained in the Master Collection (albeit perhaps only a portion of such categories). Thus, plaintiff has alleged plausible copying of constituent elements and substantial similarity.

Plaintiff also alleges that the Master Collection, or portions of it, was improperly reproduced on defendants' website. *Id.* at ¶¶ 179-80. Without addressing the sufficiency of alleging that the actual Master Collection was posted to the internet, reading the complaint in the light most favorable to plaintiff raises an inference that constituent elements of the Master Collection were posted. Thus, plaintiff has alleged sufficient facts to show the plausible existence of the elements required to establish a claim for copyright infringement.

## B. Originality

Defendants' challenge that plaintiff failed to allege copying of original elements, as required by the second element, is also wrong. (Defs.' Br. in Supp. 31); (Defs.' Reply Br. 19). The bulk of defendants' argument appears either to insist that the complaint is insufficient because plaintiff has not explicitly used the word "original" in its allegations of copying, or that plaintiff has not proved the originality of copied elements. Defendants primarily point to the fact that plaintiff's registration certificate excludes material from vendors or in the public domain, and that the

"overwhelming majority" of the Master Collection is not original. (Defs.' Br. in Supp. 31, 32).

It is true that compilations (and other work) may consist of protectable and non-protectable material; that is, original and non-original material. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 348 (1991). As regards a compilation, it is the "choices as to selection and arrangement" of collected data that are sufficiently original as to be protectable. *Id.* Here, as discussed above, plaintiff has alleged that the Master Collection contains a classification system that organizes data into categories, that the Spreadsheet contained categories, and that defendants copied from the Spreadsheet. (Second Am. Compl. ¶¶ 26, 77, 78). Plaintiff also alleges that defendants intended to use the Spreadsheet to "add Edgenet's . . . taxonomy categories to the GDSN." *Id.* at ¶ 79. Because categorization requires selection and arrangement, it is plausible that the categories are original. Further, because defendants allegedly copied the Spreadsheet with intent to add the taxonomy categories to the GDSN, it is plausible that defendants in fact copied the plausibly original categories. Thus, read in the light most favorable to the plaintiff, it is entirely plausible that defendants copied original material.[18] Therefore, because the complaint shows the plausible existence of the required elements and originality,

---

[18]Additionally, the court finds persuasive the caselaw presented by plaintiff that inquiry into originality is not appropriate at the pleading stage. *See, e.g., Kregos v. Associated Press*, 937 F.2d 700 (2d Cir. 1991) ("The validity of [a] copyright in a compilation of facts cannot be rejected as a matter of law for lack of the requisite originality and creativity.").

plaintiff has alleged sufficient facts to establish a plausible claim to copyright infringement.

### C.    Merger Doctrine

Finally, plaintiff's copyright claim does not fail under the merger doctrine. The merger doctrine "refers to the situation in which there is only one feasible way of expressing an idea, so that if the expression were copyrightable it would mean that the idea was copyrightable, and ideas are not copyrightable." *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 928 (7th Cir. 2003). The main thrust of defendants' argument is that plaintiff essentially pled itself out of a claim by alleging that its Master Collection is the only way to express the underlying idea. (Defs.' Br. in Supp. 33). In such a case, the copyright would not be valid and thus fails the first element. Defendants point to paragraph 35 of the complaint, which alleges that "[i]n light of the number and complexity of products and product attributes encompassed in Edgenet's [Master Collection], a competitor could not independently develop a substantially similar arrangement of attributes without stealing or misusing Edgenet's intellectual property." (Second Am. Compl. ¶ 35). Defendants disingenuously present only a portion of that paragraph, taken out of context. The paragraph in question actually leads off by alleging that "[a]ny company that might wish to develop its own *version* of a collection taxonomy and attributes . . . would have to spend substantial time, money and effort; would need to employ dozens of individuals; and would need unique market access to participants in the hardlines industry." *Id.*

(emphasis added). Simply by use of the word "version," it is clear that plaintiff alleges other ways to create a similar product.[19] Taken in context, the passage cited by defendants becomes an allegation that defendants could not have developed their own version in such a short period without stealing or misusing the Master Collection. Thus, plaintiff has not pled itself out by alleging merger of expression and idea. Any further inquiry into merger is inappropriate at the pleading stage because no further factual record has been developed. As discussed earlier, copyright registration is *prima facie* evidence of validity. Accordingly, defendants' merger argument fails. Because plaintiff has sufficiently alleged the plausible existence of copyright infringement, and has not pled itself out under the merger doctrine, plaintiff's allegation of copyright infringement does not fail to state a claim.

## VI. MISAPPROPRIATION OF TRADE SECRETS

In Count VII, plaintiff claims defendants misappropriated its trade secrets in violation of Wisconsin's Uniform Trade Secrets Act, Wis. Stat. § 134.90. (Second Am. Compl. ¶¶ 189-98). Defendants challenge this claim, asserting that the complaint does not sufficiently allege the material to be a trade secret, either because the information is readily ascertainable or has not been kept secret, that the complaint fails to specify which portions of the Master Collection are trade secrets, and that it fails to sufficiently allege misappropriation. (Defs.' Br. in Supp. 34-37). Under Wisconsin law, it is a violation to misappropriate a trade secret by acquiring

---

[19]The term "version" means "a particular form or variant of something." The Random House Dictionary of the English Language, Unabridged 2115 (Stuart Berg Flexner ed., 2d ed. 1987).

such through improper means, or by disclosing or using such without express or implied consent in certain situations. Wis. Stat. § 134.90(2). A trade secret is defined as including a "compilation," and the information must "derive[] independent economic value, actual or potential, from not being generally know to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Wis. Stat. § 134.90(1)(c). Further, the information must be "the subject of efforts to maintain its secrecy that are reasonable under the circumstances." Wis. Stat. § 134.90(1)(c). The Act is intended to be interpreted in uniformity with the laws of other states using the same model. Wis. Stat. § 134.90(7); *see also Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 858, 434 N.W.2d 773, 779-80 (1989) (decisions in other jurisdictions involving the Act to be given "careful consideration"). Accordingly, to establish a claim for misappropriation of a trade secret, a plaintiff must show: (1) the information is economically valuable; (2) the value is the result of not being generally known to or readily ascertainable by others who could obtain value from it; (3) the plaintiff took reasonable steps to maintain its secrecy; and (4) the defendant misappropriated the information. Defendants do not dispute, and plaintiff sufficiently alleges, the information is economically valuable. *See* Second Am. Compl. ¶¶ 36-39. The court addresses the remaining three elements and defendants' arguments below, finding the plausibility of the requisite value from not being readily ascertainable, sufficient specificity as to

the trade secrets alleged, plausible existence of reasonable efforts to maintain secrecy, and plausible misappropriation.

## A.    Value From Lack of Ready Ascertainment

Defendants fail in their argument that the Master Collection and the Spreadsheet both consist entirely of information that is readily ascertainable, and thus are not trade secrets.  (Defs.' Br. in Supp. 34-35); (Defs.' Reply Br. 20-21).  Defendants first stress the point that "mere variations on widely used information" and "combination[s] of otherwise known data" are not trade secrets, citing an Eighth Circuit opinion.  *Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002).  Though these quotations are accurate, the presentation is misleading.  The court in *Strategic Directions* actually wrote, in full, that "[s]imply to assert a trade secret resides in some combination of otherwise known data, is not sufficient."  *Id.* (citing Second Circuit).  Thus, contrary to defendants' argument, there are some situations in which a "combination of otherwise known data" may in fact be a trade secret – hence the court's use of the phrase "*mere* variations."  *Id.* (emphasis added).  This is evident from the text of the statute:  trade secrets include "compilation[s]."  Wis. Stat. § 134.90(1)(c).  It is further evident from Seventh Circuit caselaw:  "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."  *Minnesota Mining & Mfg. Co. v. Pribyl*, 259

F.3d 587, 595-96 (7th Cir. 2001).  Thus, even if plaintiff's Master Collection and Spreadsheet were simply compilations of otherwise public data, that alone would not foreclose the claim as a matter of law.

However, plaintiff's Master Collection and Spreadsheet are in fact alleged to be more than just a compilation of public data.  These documents allegedly contain taxonomy categories that organize the otherwise potentially public data in particular ways.  (Second Am. Compl. ¶¶ 26, 77).  Further, plaintiff alleges that such compilations would not be possible to create without extensive effort and money, and that even then, the result would be a "version" of such documents, not the exact same configuration.  *Id.* at ¶ 35.  In light of such factual allegations, it is plausible that the compilations contained in the Master Collection and Spreadsheet are not readily ascertainable by reason of being compilations.[20]

Defendants also unpersuasively argue that the information is readily ascertainable because it may be discovered through reverse engineering.  (Defs.' Reply Br. 21); *Coenco, Inc. v. Coenco Sales, Inc.*, 940 F.2d 1176, 1179 (8th Cir. 1991); *Norwest Trasnp., Inc. v. Horn's Poultry, Inc.*, 23 F.3d 1151, 1154 (7th Cir. 1994).  Assuming without deciding that the mere possibility of reverse engineering

---

[20]Defendants also attempt to distinguish *Minnesota Mining* by pointing out that the Seventh Circuit determined that the information at issue was a "unified process", 259 F.3d at 596, and then arguing that plaintiff failed to allege that defendants improperly acquired a "unified process." Defendants appear to fault plaintiff for failing to use the same legally conclusory language that it elsewhere attacks as being insufficient under *Twombly*.  Defendants cannot have it both ways.  It is clear under the facts alleged in the cited paragraphs that the Master Collection and Spreadsheet are plausibly "unique combinations" as approved of in *Minnesota Mining*.  259 F.3d at 595-96.

is in fact sufficient to establish ready ascertainment,[21] defendants' argument still fails.

"Reverse engineering is the process by which a person takes a *legitimately acquired* item, disassembles it to learn its component parts, and from that process determines how the product is manufactured." *Motorola, Inc. v. Computer Displays Int'l, Inc.*, 739 F.2d 1149, 1152 n.4 (7th Cir. 1984) (emphasis added); *see also BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 708 (7th Cir. 2006) ("lawful availability of products that can be reverse engineered" support terminating an injunction); *Laff v. John O. Butler Co.*, 381 N.E.2d 423, 433 (Ill. App. Ct. 1978) ("a trade secret is open to anyone, not bound by a confidential relationship or a contract with the secret's owner, who can discover the secret through lawful means"). Defendants cite paragraph 77 of the complaint to establish plaintiff's admission that reverse engineering is possible. (Defs.' Reply Br. 21). Plaintiff's allegation states that, after having misappropriated the Spreadsheet, defendants can now "reverse-engineer" it. (Second Am. Compl. ¶ 77). However, in the light most favorable to the plaintiff, this court reads the allegation to refer only to the act of working backward from an item. Under the legal definition, reverse engineering may not occur without legitimate acquisition. Because defendants allegedly acquired the Spreadsheet by non-legitimate methods, they have no ability to reverse engineer the information in

---

[21]*But cf. La Calhene, Inc. v. Spolyar*, 938 F. Supp. 523, 529-30 (W.D. Wis. 1996) (in preliminary injunction context, evidence that information may be reverse engineered does not establish that information is not a trade secret); *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 899 (Minn. 1983) (a finding that information cannot be *readily* reverse engineered can support finding of trade secret).

a manner that supports finding ready ascertainment. To find otherwise would fly in the face of common sense. There is an obvious difference between reverse engineering a product once it is placed in the public sphere and "reverse engineering" information through direct, improper access to the secret itself.[22] Aside from that one apparently poorly chosen phrase, the plaintiff nowhere else alleges facts that show the information is readily ascertainable by reverse engineering.[23] Therefore, the facts alleged do not establish ready ascertainment.

In sum, defendants' arguments as to whether the Master Collection and the Spreadsheet are readily ascertainable appear to be, in reality, disputes over the accuracy of the factual allegations, an inappropriate consideration at the pleading stage. Plaintiff has alleged value through competitive advantage as a result of the information not being generally know or readily ascertainable. (Second Am. Compl. ¶¶ 33-35, 191-92). Thus, plaintiff has satisfied the second element.

## B. Sufficiency of Specificity as to Trade Secrets

Defendants' charge of lack of specificity also fails. Defendants cite *Minnesota Mining* for the proposition that a plaintiff must "point to concrete secrets" as opposed to merely directing the court toward a "broad area" of technology. 259 F.3d at 595 n.2. The case which the *Minnesota Mining* court cites in its footnote did in fact

---

[22]It would make no sense to allow a party that misappropriated a secret to then escape accountability by claiming that because they now have access to the secret it is no longer a secret and thus not protectable.

[23]In fact, it seems a fair inference that were the Master Collection capable of reverse engineering, a competitor would have likely done so by now, given the alleged competitive advantage it provides.

express such a proposition, but it did so while reviewing the sufficiency of the evidence supporting a jury verdict. *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992). In *Minnesota Mining*, plaintiff is correct to point out that the court was presented with the issue at the summary judgment stage and, in fact, found that a trade secret could still exist even without 3M pointing to specifics within more than 500 pages of manuals. 259 F.3d at 598. In fact, by reading more than just a phrase from that case, it becomes apparent that the issue in *Minnesota Mining* in fact dealt with whether the manuals constituted a properly protected "compilation." *Id.* at 595-96. As discussed above, plaintiff has sufficiently alleged a plausible compilation. Defendants cite one other major case to support their specificity argument, but that case was decided on summary judgment. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581 (7th Cir. 2002). However, not only was the standard of review different, but the original case which the Seventh Circuit affirmed as to the summary judgment noted that "[a]t the complaint stage . . . plaintiff is not and cannot be expected to plead its trade secrets in detail." *IDX Sys. Corp. v. Epic Sys. Corp.*, 165 F. Supp. 2d 812, 816 (W.D. Wis.

2001), *aff'd in part & rev'd in part*, 285 F.3d 581 (7th Cir. 2002).[24]  Thus, to the extent

that defendants' specificity argument asks for evidence of qualification as a trade

secret, such inquiry is improper at the pleading stage.  To the extent that defendants'

argument is merely an alternate way of arguing that compilations may not be

afforded trade secret status, it has been disposed of in prior discussion.  And to the

extent that defendants' argument is questioning the sufficiency of facts showing a

trade secret at all, such argument has also been disposed of above.  Therefore,

plaintiff has pled sufficiently specific facts for this stage of the litigation.

## C.    Secrecy

To the extent that defendants argue that plaintiff does not allege reasonable

efforts to keep the information secret, it too is a failing argument.  Defendants argue

that plaintiff has pled itself out of the trade secrets claim because it shared "key

aspects" of the Master Collection with customers and suppliers, and failed to identify

---

[24]Confusingly, other cases defendants cite to support their argument have little or no bearing on the issue whatsoever. *See Accenture Global Servs. GMBH v. Guidewire Software, Inc.*, 581 F. Supp. 2d 654, 661-64 (D. Del. 2008) (dismissing for failure to plead improper acquisition, use, or disclosure – not lack of specificity as to the trade secret); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 568 F. Supp. 2d 1369, 1377 (M.D. Fla. 2008) (dismissing for failure to plead how defendants allegedly used trade secrets – not lack of specificity); *Mach 1 Air Servs., Inc. v. Garcia*, 2008 WL 3200777 at *3 (D. Ariz. 2008) (dismissed for failure to indicate any trade secret at all as well as how it was improperly used); *Del Monte Fresh Produce Co. v. Dole Food Co. Inc.*, 148 F. Supp. 2d 1322, 1325 (S.D. Fla. 2001) (discussing requirement of compelled trade secret disclosure in order make *factual determination* of whether trade secret exists); *FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995) (not enough *evidence* of trade secrets in seven areas comprising bulk of manufacturing process to justify injunction preventing former employee from working elsewhere); *Analog Devices, Inc. v. Michalski*, 579 S.E.2d 449, 453-54 (N.C. Ct. App. 2003) (in asking for preliminary injunction, plaintiff did not produce sufficient *evidence*).  To the extent that *Analog Devices* teaches anything about specificity at the pleading stage, it requires only that particularity sufficient "to enable a defendant to delineate that which he is accused of misappropriating." 579 S.E.2d at 453.  It is clear that defendants are easily able to delineate what they are accused of misappropriating: the entire Master Collection.

anything in the Spreadsheet not shared with the "entire supply chain." (Defs.' Reply Br. 21). This appears to be an argument that plaintiff did not make sufficient efforts to protect the secrecy of the information, as required under § 134.90(1)(c). However, plaintiff also alleges that it contracts with both retailers and suppliers to collect and provide data (Second Am. Compl. ¶ 19), and that "clients" were required to sign confidentiality and non-disclosure agreements and were only permitted limited access. *Id.* at ¶ 34. This raises a plausible inference that the retailers and suppliers are in fact the "clients" required to keep the information in question secret. Plaintiff further alleges a whole host of other efforts taken to keep their information secret. *Id.* at ¶ 192. Thus, plaintiff sufficiently alleges reasonable efforts to keep the information secret as required by the third element.

### D. Misappropriation

Finally, defendants are unsuccessful in their argument that plaintiff has failed to sufficiently allege misappropriation, specifically that plaintiff does not allege theft of the Master Collection, but only of the Spreadsheet, and that no alleged facts suggest the Spreadsheet contains trade secrets. (Defs.' Br. in Supp. 37). In order to be liable for disclosure or use, the defendant must have either: acquired the secret through improper means; or, at the time of use, know or have reason to know he or she obtained the secret from, *inter alia*, a person owing a duty to the plaintiff to "maintain its secrecy or limit its use." Wis. Stat. § 134.90(2)(b). As explained in the copyright discussion, Section V.B, plaintiff has alleged that the Master Collection

contains a classification system that organizes data into categories, that the Spreadsheet contained categories, and that defendants used the Spreadsheet. (Second Am. Compl. ¶¶ 26, 77, 78). Plaintiff also alleges that defendants intended to use the Spreadsheet to "add Edgenet's . . . taxonomy categories to the GDSN." *Id.* at ¶ 79. Because defendants allegedly copied the Spreadsheet with intent to add the taxonomy categories to the GDSN, it is plausible that defendants obtained categories from the Master Collection through the Spreadsheet, and that the Spreadsheet is simply a portion of the trade secret constituted by the Master Collection. Further, plaintiff sufficiently pled use, *id.* at ¶ 81, acquisition from one under a duty to keep the material secret, *id.* at ¶¶ 34, 77, 192, and knowledge or reason to know of that duty, *id.* at ¶¶ 79-80, 83-84, 194. Therefore, the complaint sufficiently alleges plausible misappropriation.

Accordingly, because plaintiff has alleged economic value, resulting from lack of general knowledge or ready ascertainment, reasonable steps to keep the information secret, and misappropriation, plaintiff has alleged facts sufficient to establish plausible trade secret misappropriation.

## VII. NEW JERSEY CONSUMER FRAUD ACT

Plaintiff's eighth claim alleges that defendants GS1 U.S. and 1SYNC ("Nonprofit Defendants") violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2, 56:8-2.7. (Second Am. Compl. ¶¶ 199-203). Defendants argue that plaintiff has failed to sufficiently allege an ascertainable loss proximately caused by

defendants, that plaintiff is not a consumer under the Act, and that the services offered by plaintiff do not qualify for protection under the Act. (Defs.' Br. in Supp. 37-41).

The first section prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, [sic] concealment, suppression, or omission of any material fact with intent that others rely upon such . . . in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2. The second section at issue prohibits selling or offering to sell "any goods, wares, merchandise or services" where the seller falsely represents, or the consumer is falsely led to believe, that the sale is by or on behalf of a nonprofit organization. N.J. Stat. Ann. § 56:8-2.7. The private cause of action is created in a separate section, which provides that "any person" suffering an "ascertainable loss" caused by conduct declared unlawful under the Act may bring an action. N.J. Stat. Ann. § 56:8-19. Stating a claim requires three elements: "(1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Dabush v. Mercedes-Benz USA, LLC*, 874 A.2d 1110, 1115 (N.J. Super. Ct. App. Div. 2005). Because the court finds that the Act does not apply to the transactions in question, it need not discuss ascertainable loss and proximate cause.

## A. Application of the Act to the Alleged Transactions

The court finds no application of § 56:8-2 to the conduct at issue. While defendants somewhat separately argue against both plaintiff's status as a consumer, as well as the status of the services plaintiff provides (Defs.' Br. in Supp. 39-41), the arguments are more properly dealt with as one theory. The Act "is not intended to cover every transaction that occurs in the marketplace. Its applicability is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself." *Arc Networks, Inc. v. Gold Phone Card Co., Inc.*, 756 A.2d 636, 638 (N.J. Super. Ct. Law Div. 2000). There is a distinction under the Act between misrepresentations of fact and mere puffery. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997); *Dabush*, 874 A.2d at 1116. In order for a misrepresentation or other unlawful act to occur "in connection with" the sale of services, it must be "one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Gennari*, 691 A.2d at 366.

As the court reads the complaint, plaintiff alleges a number of instances of unlawful conduct. These include the Nonprofit Defendants falsely holding themselves out as nonprofits (Second Am. Compl. ¶¶ 5, 41, 43, 103, 106-07); misrepresenting their status to the IRS and committing fraud in obtaining tax-exempt status, *id.* at 53, 92, 103-05; committing tax, mail and wire fraud, *id.* at ¶¶ 40, 62; publishing false statements regarding their ability to meet clients' needs, *id.* at ¶¶ 50,

60; misrepresenting the purpose and operation of the HEAI project , *id.* at ¶¶ 64-65, 67, 76; and misrepresenting the process and creation of new attributes, *id.* at ¶¶ 80, 83-88, 91, 101.

The allegedly false holding out as nonprofits and misrepresentation of status and fraud to the IRS do not fall under the Act. Though Nonprofit Defendants may have procured their nonprofit status through fraud or other impermissible conduct, the fact remains that they are in fact nonprofit organizations. *See, e.g., id.* at ¶ 47. Thus, any representation of tax-exempt status is not technically false. Nor were any alleged false representations to the IRS made in connection with the sale of services. The Nonprofit Defendants were not selling anything to the IRS. To attach a connection to services sold to clients is too attenuated. Ruling otherwise would morph the Act into a tool to attack nearly any business which allegedly commits tax fraud. This is surely not the intent of the act. Additionally, plaintiff's other general allegations of tax, mail and wire fraud are too conclusory to support a plausible claim to relief under *Twombly*. Thus, the Act does not cover these actions.

Further, Nonprofit Defendants' alleged false statements, including "1 Source. 1 Solution," the ability to meet all needs, and the statement of belief that all of Home Depot's needs can be met through the GDSN are no more than puffery.[25] Thus, the Act does not apply to these allegations either.

---

[25]Again, ruling otherwise would expand the Act to ridiculous proportions.

Finally, the alleged misrepresentations regarding the HEAI project and creation of the attributes also fall outside the Act. While such statements, and the standard-setting process, may be tied to the ultimate goal of gaining more customers somewhere down the line, the most immediate characterization is not one of consumer transactions. These statements were made to members of the "product data community," allegedly for purposes of gaining competitive advantage by masking other unlawful conduct, such as copyright infringement. *Id.* at ¶¶ 80-94. While some of these community members are simultaneously consumers of data pool services, their role in these transactions were more akin to advisers, participants or interested parties. None of the alleged misrepresentations regarding the HEAI project or ultimate standard adoption show any intent to induce consumers to buy Nonprofit Defendants' services. In fact, though other misconduct may have occurred within the standard-setting process, the end result would be to make the allegedly proprietary information available as a service from a broader range of data pool operators. These standards are applicable and available to all certified data pool operators. The alleged misrepresentations in question simply cannot be characterized as consumer transactions, and thus fall outside of the Act.

## B.  Sale on Behalf of Nonprofit Organization

While no direct arguments are made on the issue of the applicability of section 56:8-2.7 to the transactions in question, the court finds no claim under the alleged facts. Though Nonprofit Defendants may have procured their nonprofit status

through fraud or other impermissible conduct, the fact remains that they are in fact nonprofit organizations. *See, e.g.,* Second Am. Compl. ¶ 47. Nor have Nonprofit Defendants violated the section by alleged false representation to the IRS because any such representations were not made to solicit funds, contributions, or sell their services. Thus, because Nonprofit Defendants have not falsely represented themselves as nonprofits while selling their services, they have not violated said section. Because the complaint, read in the light most favorable to plaintiff, still fails to allege facts showing plausible conduct falling under either § 56:8-2 or § 56:8-2.7, there is no plausible claim to relief under the New Jersey Consumer Fraud Act, and the claim must be dismissed.

## VIII. COMMON LAW MISAPPROPRIATION AND UNJUST ENRICHMENT

Lastly, plaintiff alleges two claims in the alternative to its claims for copyright infringement and misappropriation of trade secrets. Count IX claims a violation of common law misappropriation, and Count X claims common law unjust enrichment. (Second Am. Compl. ¶¶ 204-18). Defendants argue both are preempted by the Copyright Act. Under section 301 of the Copyright Act, state law claims equivalent to those under the Act are preempted. 17 U.S.C. § 301(a). If the work in question is fixed in tangible form and within the subject matter of the Act, then "to avoid preemption, a state law must regulate conduct that is qualitatively distinguishable from that governed by federal copyright law." *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 909-10 (7th Cir. 2005). The Copyright Act guarantees the exclusive right to

reproduce, prepare derivative works, distribute copies, perform works publicly, and display works publicly. 17 U.S.C. § 106. As previously discussed, plaintiff has sufficiently alleged that the work in question is a compilation, and compilations are within the subject matter of the Copyright Act. *See* 17 U.S.C. § 103. Thus, the court must determine whether the state law claims regulate equivalent conduct.

Equivalency may exist where infringement occurs immediately upon taking an action protected under § 106, or where there are additional elements that do not differ in kind from that necessary for copyright infringement. *Through the Door, Inc. v. J.C. Penny Co.*, 2007 WL 2265781, at *2 (W.D. Wis. 2007) (citing Seventh Circuit). Common law misappropriation in Wisconsin requires: "(1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff." *Mercury Record Prods., Inc. v. Econ. Consultants, Inc.*, 64 Wis. 2d 163, 174, 218 N.W.2d 705, 709 (1974). As our sister court has noted, "[a]lthough misappropriation under Wisconsin law includes additional elements that the parties be in competition with one another and that there is commercial damage to plaintiff, these elements add nothing of substance to the elements of the copyright claim." 2007 WL 2265781 at *3. Here, plaintiff claims misappropriation harm from improper copying, but the fact that plaintiff is required to have expended money and effort, be in competition, and suffer commercial damage do nothing to qualitatively distinguish the claim from one for improper

copying under copyright law. It simply becomes a more narrow version of the copyright claim.

Plaintiff's claim of unjust enrichment suffers the same fate. Unjust enrichment requires: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof." *Seegers v. Sprague*, 70 Wis. 2d 997, 1004, 236 N.W.2d 227, 230 (1975). Again, plaintiff's claim focuses on the benefit conferred as a result of improper copying. Under the facts alleged, improper production of a derivative, as prohibited by the Copyright Act, confers a benefit on the defendant, is appreciated by the defendants, and acceptance of the benefit from a copyright violation without payment would necessarily be inequitable. Thus, the two in this case are qualitatively indistinguishable.

Plaintiff briefly argues that this issue rests on questions of fact and is thus inappropriate for decision at the pleading stage. Plaintiff is incorrect. The court is not determining the merits of the common law claims at this point, nor the merits of the copyright claim. Instead, the court is applying the standard of proof at the pleading stage. Viewed in the light most favorable to the plaintiff, and accepting all well-pleaded facts as true, there are no facts alleged which suggest the plausible existence of a misappropriation or unjust enrichment claim which could exist independent of the copyright claim.

In the case of misappropriation, there exists a possible claim in which a cause of action arises simply from the act of taking information. Because the act of taking does not alone involve reproduction, derivation, distribution, performance, or display, such could still satisfy the other elements of common law misappropriation without implicating copyright infringement. However, in the case at hand, the facts alleged by plaintiff require the use of the supposedly misappropriated information by defendants in order to satisfy the commercial damage prong of the claim. Under these facts, commercial damage only occurs if plaintiff loses its competitive advantage by the integration of its information into the GDSN. Consequently, that use, in order to cause commercial damage, must necessarily involve some form of copying – either reproduction, distribution, or derivation. No other use could support the damages alleged by plaintiff, that is, the loss of competitive advantage and accompanying profits, clients, and so on that would occur from integration of plaintiff's information into GDSN standards. Thus, without use, which is here necessarily regulated by the Copyright Act, plaintiff cannot state an independent claim for common law misappropriation. Therefore, because the claim necessarily lives or dies by the existence of a Copyright claim, it is either: sufficiently plead, but only in a way that leads to preemption due to being qualitatively indistinguishable; or, the requisite elements do not exist and the allegations thus fail to state a claim on their own.

The same logic holds true for the unjust enrichment claim.  The only way in which the information obtained can support the existence of a benefit to defendants is if such information is put to use in a way that destroys plaintiff's competitive advantage.  As discussed above, such use must necessarily involve one of the protected rights under the Copyright Act.  Therefore, the facts alleged either establish a claim that is qualitatively indistinguishable from copyright infringement, or fail to sufficiently show the existence of a benefit and thus fail to state a claim independently.

Additionally, plaintiff is not saved by the fact that the information in question may later be determined insufficiently original to support copyright protection.  As the Seventh Circuit has stated, in a decision reviewing 12(b)(6) dismissal, "states may not create copyright-like protections in materials that are not original enough for federal protection."  *Toney*, 406 F.3d at 911.  Thus, it is immaterial whether the information is sufficiently original.  Rather, it is the conduct regulated that is the heart of a preemption inquiry.  Therefore, because the common law claims are either qualitatively indistinguishable from a copyright claim and thus preempted, or would independently fail to state a claim, plaintiff has failed to allege facts sufficient to state a claim for either common law misappropriation or unjust enrichment.

## IX.    TYPE OF DISMISSAL

Plaintiff and defendants also dispute whether any dismissal should be with or without prejudice, framing the argument in terms of whether plaintiff is entitled to

leave to amend. Leave to amend is to be given freely when justice so requires. Fed. R. Civ. P. 15(a)(2). However, dismissal with prejudice remains within the discretion of the court. *See James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 401 (7th Cir. 2006). At the same time, the procedural history of the case becomes relevant. *Fannon v. Guidant Corp.*, 583 F.3d 995, 1002 (7th Cir. 2009). In *Fannon*, the court affirmed a dismissal with prejudice where the action began as nine individual complaints, and the plaintiff had a year to review and investigate before filing a consolidated complaint. *Id.* at 1001. The *Fannon* defendants filed a motion to dismiss and, while under advisement, the plaintiff twice notified the district court of new information but never attempted to offer an amended complaint. *Id.* The order for dismissal was entered almost one year and eight months after the consolidated complaint. *Id.* at 1001-02. In affirming the dismissal, the circuit court wrote that "[t]he district court was entitled to view this case as one in which the plaintiffs had, as a practical matter, a number of opportunities to craft a complaint that complied with the standards of the PSLRA. It was therefore entitled to bring this litigation to a close with a dismissal of prejudice." *Id.* at 1002.

Given the discretion of the court in this matter, and in light of the more than one year and eight month pendency as well as two amended complaints, the court finds that the wiser exercise of its discretion is to dismiss with prejudice. *Fannon* is sufficiently analogous to support this decision, teaching that a reasonable opportunity to construct a complaint that states a claim, and failing to do so, is

grounds enough for exercise of a court's discretion. Here, plaintiff filed an Amended Complaint, after which defendants moved to dismiss and briefed their motions. Plaintiff then moved for leave to file a Second Amended Complaint, indicating in their brief that the new attorneys had done investigation and research leading to new legal claims and "significantly more detailed" factual allegations. (Docket #34). The new complaint jettisoned most of the first complaint's claims, rendering the pending motions to dismiss moot. Defendants have now moved once more for dismissal and fully briefed again. In sum, plaintiff has had ample time to construct a proper claim. Additionally, though plaintiff argues it should be allowed to re-plead if any deficiencies exist (Pl.'s Br. in Opp. 49), *James Cape* holds that dismissal with prejudice is not an abuse of discretion where a court has "no way of knowing what the proposed amendment entail[s]." 453 F.3d at 401. Thus, the court is obliged to dismiss the claims in question with prejudice.

## CONCLUSION

After lengthy discussion, the court finds that plaintiff has failed to state a claim as to Count I, Monopolization under the Sherman Act, 15 U.S.C. § 2, because of a failure to allege sufficient facts to show the plausible existence of antitrust injury. Plaintiff has also failed to state a claim as to Count II, Monopolization under the Wisconsin Antitrust Act, Wis. Stat. § 133.18, because of a failure to allege sufficient facts to show the plausible existence of antitrust injury. The analysis undertaken for Count I controls the outcome of Count II. Count III of the complaint, a civil violation

under RICO, 18 U.S.C. § 1962(c), also fails to state a claim due to a lack of sufficient allegations to show the necessary "pattern of racketeering activity." As to Count IV, civil RICO conspiracy under 18 U.S.C. § 1962(d), no allegations support the plausible existence of a legally possible RICO violation and there can be no conspiracy to violate RICO where the acts conspired to perform would not violate RICO. Thus, Count IV fails to state a claim. Count V, violation of the Wisconsin Organized Crime Control Act under Wis. Stat. § 946.80 *et seq.*, also fails to state a claim due to the same failure to allege sufficient facts showing the plausible existence of the necessary "pattern of racketeering activity." Counts VI and VII, Copyright Infringement under 17 U.S.C. § 501 *et seq.* and Misappropriation of Trade Secrets under Wis. Stat. § 134.90, both allege sufficient facts to state plausible claims for relief and thus survive this motion. Plaintiff fails to state a plausible claim for relief on Count VIII, violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2 and 56:8-2.7, because the Act does not apply to the transactions in question and defendants GS1 U.S. and 1SYNC have not in fact falsely represented themselves as nonprofit organizations. Finally, both Counts IX and X, Common Law Misappropriation and Unjust Enrichment, fail to state a claim because they are either preempted by the Copyright Act or would fail to state a claim if they fell outside preemption.

Accordingly,

**IT IS ORDERED** that the defendants' Motion to Dismiss Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (Docket #56) be and the same is hereby **GRANTED in part** and **DENIED in part**; and

**IT IS FURTHER ORDERED** that **Counts One, Two, Three, Four, Five, Eight, Nine, and Ten** of the plaintiff's Second Amended Complaint (Docket #43) be and the same are hereby **DISMISSED with prejudice**.

Dated at Milwaukee, Wisconsin, this 27th day of September, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge