# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

EDGENET, INC.,

                Plaintiff,

     v.                                            Case No.  09-CV-65

GS1 U.S., INC., 1SYNC, INC.,
AMERICAN HARDWARE MANUFACTURERS
ASSOCIATION, and GS1 AISBL,

                Defendants.

---

# ORDER

On April 22, 2011, defendant GS1 AISBL ("GS1 Global") filed a Motion to Dismiss for Lack of Jurisdiction (Docket #87) pursuant to Federal Rule of Civil Procedure 12(b)(2).  The motion follows the court's recent decision dismissing a number of plaintiff Edgenet, Inc.'s ("Edgenet") claims in its Second Amended Complaint.  Because the court dismissed, *inter alia*, Edgenet's conspiracy claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), GS1 Global is no longer subject to the nationwide service of process authorized under RICO.  As such, GS1 Global has renewed its earlier motion to dismiss for lack of personal jurisdiction that it made prior to the inclusion of Edgenet's RICO claim.  GS1 Global has incorporated its earlier briefing, as has Edgenet, in addition to further briefing with regard to this motion.  Because the court concludes that it lacks personal jurisdiction over GS1 Global, it will grant the motion to dismiss.

## BACKGROUND

The plaintiff bears the burden of establishing personal jurisdiction and need only make a prima facie showing, thus the court must "take as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). GS1 Global is an international non-profit organized under the laws of Belgium and with its principal office in Brussels, Belgium. (Second Am. Compl. ¶ 8) (Docket #43); (Walsh Decl. ¶ 1) (Docket #16). It maintains an office, alleged by Edgenet to be its principal place of business, in Lawrenceville, New Jersey. (Second Am. Compl. ¶ 8). GS1 Global develops and controls certain standards and products, such as bar codes, used by suppliers and retailers to move products through the global supply chain. (Second Am. Compl. ¶ 9). GS1 Global has no office or registered agent for service of process in Wisconsin. (Walsh Decl. ¶¶ 3-4). In this action, Edgenet has alleged that GS1 Global improperly obtained Edgenet's trade secrets and copyrighted work and then improperly disseminated those materials, as well as improperly made use of those materials.

## I.   GS1 GLOBAL'S WEBSITE

GS1 Global has direct control over the website http://www.gs1.org. (Walsh Decl. ¶ 10); (Rudolph Decl. ¶¶ 29-30) (Docket #20); (Second Am. Compl. ¶ 179). That website contains an "on-line Community Room," GS1 Global's Global Data Dictionary, and provides a means of accessing the Global Standards Management

Process.  (Walsh Decl. ¶ 10); (Rudolph Decl. ¶ 33-34, 36); (Shaw Decl. Ex. H) (Docket #89).

## A.    The On-Line Community Room

The Community Room is available to any user that registers an account with GS1 Global and provides a place to participate in the Global Standards Management Process, facilitating communication between users as well as with GS1 Global. (Rudolph Decl. ¶¶ 36, 38-39); (Walsh Decl. ¶ 10).  The Community Room provides a location to view and comment on Global Data Synchronization Network ("GDSN") rules, amended rules, and proposed rules.  (Rudolph Decl. ¶ 39).  In 2008, Edgenet alleges that portions of its trade secrets and copyrighted works were posted in the Community Room in formats that could be viewed and downloaded by any registered user.  (Second Am. Compl. ¶¶ 77, 93).

## B.    The Global Standards Management Process

The Global Standards Management Process ("GSMP") is used by GS1 Global to develop standard methods and rules for describing the product information exchanged through the GDSN.  (Rudolph Decl. ¶ 32).  The GSMP is conducted according to rules published in the GSMP Manual, published by GS1 Global and also made available for download on its website.  (Rudolph Decl. ¶ 33).  GS1 Global supervises the GSMP and is responsible for ratifying changes to both the GDSN Rules as well as the GSMP rules.  (Rudolph Decl. ¶ 33).

### C.    The Global Data Dictionary

The Global Data Dictionary is used to "store, reuse and share precise core component and business definitions and their equivalent representations in targeted standards." (Shaw Decl. Ex. H).  The Global Data Dictionary is made available to all GDSN users by virtue of its availability through the website. (*See* Shaw Decl. Ex. H).

### D.    XML Data Encoding Rules

GS1 Global develops and administers XML[1] standards for electronic business messages and the standards are part of the GDSN Rules. (Rudolph Decl. ¶ 47). Edgenet uses these XML standards in Wisconsin to encode data from Wisconsin GDSN users who belong to Edgenet's data pool.[2] (Rudolph Decl. ¶ 48). This encoding is required before the data is transmitted to the Global Registry or other data pools, including other data pools in Wisconsin. (Rudolph Decl. ¶ 48). The Global Registry is explained below.

## II.    GS1 GLOBAL'S AFFILIATES, MEMBERS, AND THE GDSN

GS1 GDSN, Inc. ("GS1 GDSN"), not a party here, is effectively a wholly-owned subsidiary of GS1 Global. (Second Am. Compl. ¶ 20); (Rudolph Decl. ¶ 14

---

[1]XML stands for Extensible Markup Language and is a markup language similar to HTML, the coding language used to craft and display websites.  XML, however, is a language used to transport and store data, unlike HTML which is only used to display data.  Thus, XML depends on other software or processes to send, receive, or display the data encoded by XML. For further information, see *XML Introduction - What is XML?*, W3Schools.com, http://www.w3schools.com/xml/xml_whatis.asp (last visited June 14, 2011).

[2]A data pool is a central repository that aggregates, organizes and delivers data between trading partners.  For further description, see the court's September 27, 2010 Order (Docket #67).

& Ex. 7); (*see also* GS1 Global Reply Br. 6) (Docket #26) (admitting, at least for purposes of motion, that GS1 Global is the sole member of GDSN, Inc., making it equivalent to a wholly-owned subsidiary). GS1 Global supervises the Global Registry and provides instruction to GS1 GDSN. (Rudolph Decl. ¶ 17). GS1 Global's CEO and President is also a member of GS1 GDSN's board, and the president of GS1 GDSN reports to GS1 Global's CEO and President. (Rudolph Decl. ¶ 17). Additionally, GS1 GDSN's policies must be approved by GS1 Global. (Rudolph Decl. ¶ 18). Recently, GS1 GDSN did not earn enough revenue to cover expenses and thus had to secure a loan from GS1 Global. (Rudolph Decl. ¶ 19). In order to bring in revenue, GDSN users pay fees to data pool providers, such as Edgenet, who then pay subscription fees to GS1 GDSN. (Rudolph Decl. ¶¶ 23-24).

GS1 Global develops and administers the GDSN, an internet-based network of interconnected data pools used to transmit product data. (Second Am. Compl. ¶ 18). However, GS1 GDSN runs the day-to-day operations with regard to the GDSN. (*See* Second Am. Compl. ¶¶ 18-20); (*See also* Rudolph Decl. ¶ 17). This includes forming participation agreements with users, permitting their use of the GDSN. (Rudolph Decl. ¶ 27). The GDSN contains a structure and rules for describing product attributes, a taxonomy used to classify and disseminate GDSN data, and data pools operated as clearinghouses for GDSN data. (Second Am. Compl. ¶¶ 18-19). There are approximately 183 Wisconsin companies that use the GDSN. (Rudolph Decl. ¶ 26 & Ex. 10). The GDSN is governed by a set of

standards and rules ("GDSN Rules"), developed and administered by GS1 Global. (Rudolph Decl. ¶¶ 33-34). GDSN Rules must be approved by GS1 Global before going into effect. (Rudolph Decl. ¶ 34). The GDSN Rules are published on GS1 Global's website and may also be downloaded there. (Rudolph Decl. ¶ 29 & Ex. 12). GDSN users are required to be familiar with the GDSN Rules and comply with them as a condition of use. (Rudolph Decl. ¶ 27 & Ex. 11).

Additionally, GS1 GDSN also operates the Global Registry, part of the GDSN system. (Rudolph Decl. ¶¶ 17, 40). The Global Registry acts as a central information directory, detailing subscription information, guaranteeing the uniqueness of registered items and parties, and ensuring all data pools in the GDSN comply with rules. (Rudolph Decl. Ex. 19). GS1 Global provides information about the Global Registry on its website. (Rudolph Decl. ¶ 40). GDSN users, including those in Wisconsin, register their products on the Global Registry. (Rudolph Decl. ¶¶ 40-45).

GS1 U.S., Inc. ("GS1 U.S.") is a member organization of GS1 Global. (Second Am. Compl. ¶ 10). GS1 Global shares office space with GS1 U.S. in New Jersey. (Second Am. Compl. ¶¶ 9-10). From 2004 to 2009, GS1 Global's current CEO and President served as CEO for both GS1 Global and GS1 U.S. (Second Am. Compl. ¶ 12). Companies that wish to obtain GS1 Global-controlled bar codes or that wish to exchange product data through the GDSN must obtain a "company prefix" made available only through these member organizations. (Second Am.

Compl. ¶ 21). GS1 Global's website specifically directs individuals to these member organizations. (Shaw Decl. Ex. C). GS1 U.S. is the sole source for U.S. companies, including those in Wisconsin, to obtain a company prefix. (Second Am. Compl. ¶ 21).

## ANALYSIS

Edgenet has not established that this court has either general or specific jurisdiction over GS1 Global and it will, therefore, grant the motion to dismiss. Personal jurisdiction over a non-resident defendant exists so long as the law of the state in which the district court is located authorizes such jurisdiction. Fed. R. Civ. P. 4(k)(1); *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1201 (7th Cir. 1997).[3] Subjection to personal jurisdiction in Wisconsin requires satisfaction of the state's long-arm statute, Wis. Stat. § 801.05, as well as a finding that the exercise of jurisdiction comports with constitutional due process. *Kopke v. A. Hartrodt S.R.L.*, 2001 WI 99, ¶ 8, 245 Wis. 2d 396, 629 N.W.2d 662. Upon a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing a prima facie case for such jurisdiction. *Steel Warehouse of Wis., Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998). Upon demonstration of a prima facie case, the burden shifts to the defendant to show that the exercise would violate due process. *Id.*

---

[3]Jurisdiction may also exist if the federal statute permits nationwide service or if the defendant is not otherwise subject to personal jurisdiction in any state, Fed. R. Civ. P. 4(k), but neither condition exists here.

Under the Constitution, due process requires certain minimum contacts with the forum state in order to exercise personal jurisdiction. *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 942-43 (7th Cir. 2000) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-76 (1985)). Sufficient minimum contacts depend on whether the exercise is one of general or specific jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997). General jurisdiction permits suit on any cause of action because of continuous and systematic contacts, whereas specific jurisdiction arises out of the particular contacts with the forum state. *Id.* The Wisconsin long-arm statute generally tracks these two types of jurisdiction. *See* Wis. Stat. § 801.05. Here, Edgenet argues that jurisdiction exists under three separate provisions of the long-arm statute, essentially arguing for the existence of both general and specific jurisdiction in this case.

## I.     GENERAL JURISDICTION

GS1 Global is not subject to general jurisdiction in Wisconsin. Under the long-arm statute, a Wisconsin court has jurisdiction over a non-resident defendant that is "engaged in substantial and not isolated activities within [the] state, whether such activities are wholly interstate, intrastate, or otherwise." Wis. Stat. § 801.05(1)(d). The Wisconsin legislature intended the long-arm statute to provide for exercise of jurisdiction to the full extent consistent with due process and thus is "to be given a liberal construction in favor of the exercise of jurisdiction." The substantial contacts

required must be "continuous and systematic." *Travelers Ins. Co. v. George McArthur & Sons*, 130 N.W.2d 852, 854 (Wis. 1964). Substantial and not isolated contacts may be established where a defendant "solicit[s], create[s], nurture[s], or maintain[s], whether through personal contacts or long-distance communications, a continuing business relationship with anyone in the state." 2010 WI App 10, ¶ 13, 322 Wis. 2d 738, 780 N.W.2d 529. Wisconsin courts look to the contacts' quantity, nature and quality, and source and connection with the cause of action, as well as the interests of the state and the convenience of the parties. *Nagel v. Crain Cutter Co.*, 184 N.W.2d 876, 881 (Wis. 1971); *Schroeder v. Raich*, 278 N.W.2d 871, 874 (Wis. 1979). Constitutionally, due process requires that the contacts be such that maintenance of the suit will not offend "traditional notions of fair play and substantial justice." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). At base, general jurisdiction "requires the defendant to have such extensive contacts with the state that it can be treated as present in the state for essentially all purposes." *Id.* at 426. The contacts must be such that they "approximate physical presence." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). As becomes relevant here, the maintenance of a public website is insufficient, standing alone, to establish general jurisdiction that comports with due process. *Id.*

Here, Edgenet first points to GS1 Global's operation of its website, and then attempts to show additional contacts justifying the exercise of general jurisdiction. Because it finds the additional contacts insufficient, even assuming the website

would otherwise tip the scales in favor of general jurisdiction, it will refrain from analyzing the website in detail here.   Edgenet lists three categories of additional contacts: (1) maintenance of continuing business relationships with forum residents; (2) agents conducting business in the forum state; and (3) making sales to forum residents.  Edgenet cites to cases to illustrate that these categories of activity justify the exercise of general jurisdiction, but the cases cited merely show that such contacts *may* be sufficient.  In each case, the court still conducted an individualized analysis, rather than simply relying on the general character or categorization of the acts.[4]  With that said, the court will proceed to analyze the asserted contacts.

Edgenet discusses contacts undertaken by GS1 Global itself, as well as by organizations that it attempts to paint as agents of GS1 Global.  While Edgenet cites to a 1994 case from this district to establish agency, *Hayeland v. Jaques*, 847 F. Supp. 630, 634 (E.D. Wis. 1994), a more recent Wisconsin appellate decision provides the proper guidance.   In analyzing whether the court had general jurisdiction over Nissan Japan, the Wisconsin Court of Appeals held that the long-arm statute's general jurisdiction provision did not authorize jurisdiction over a parent corporation on the basis of the contacts of a wholly owned subsidiary under an agency theory.   *Rasmussen v. Gen. Motors Corp.*, No. 2007AP35, 2010 WL

---

[4] *Arnold v. Miller*, No. 08-234, 2009 WL 2020838, at *3-5 (S.D. Ill. July 9, 2009); *Shepherd Invs. Int'l v. Verizon Commc'ns Inc.*, 373 F. Supp. 2d 853, 862-66 (E.D. Wis. 2005); *Thomas Publ'g Co. v. Indus. Quick Search, Inc.*, 237 F. Supp. 2d 489, 491 (S.D.N.Y. 2002); *PKWare, Inc. v. Meade*, 79 F. Supp. 2d 1007, 1012-14 (E.D. Wis. 2000); *see also PKWare*, 79 F. Supp. 2d at 1013 ("each case must be determined on its own facts").

-10-

1994047, ¶¶ 12-23 (Wis. App. May 20, 2010).[5]  The court, agreeing with a Western District of Wisconsin case analyzing the same issue, noted that "the corporate structure and corresponding presumption of separateness requires more than an agency theory to assert general jurisdiction over a parent corporation." *Id.* at ¶ 23. The court concluded that the only provision allowing jurisdiction over a parent corporation based on the agency of its subsidiary is § 801.05(4)(a), the provision authorizing specific jurisdiction based on acts performed on behalf of the defendant. *Id.* The court finds this pronouncement more persuasive than earlier cases from this district because it comes directly from a Wisconsin court, and is more recent.  As such, Edgenet's attempt to impute the activities of GS1 GDSN and GS1 U.S. for purposes of establishing the required "substantial and not isolated activities" fails. Instead, the court will analyze the remaining direct contacts of GS1 Global.

Edgenet points to "continuing business relationships" between GS1 Global and Wisconsin companies, explaining that at least ten Wisconsin companies have participated in the GSMP.  It also asserts that GS1 Global and its agents used the GSMP and the website to acquire and disseminate the materials at issue here. However, this assertion cites only to a paragraph of the complaint alleging such conduct from GS1 U.S. as well as defendants 1Sync, Inc. and American Hardware

_____

[5]The court notes that unpublished appellate opinions may not be cited in Wisconsin as precedent, but so long as an unpublished opinion was issued on or after July 1, 2009, it may be cited for persuasive value.  Wis. Stat. § 809.23(3).  Thus, despite the fact that *Rasmussen* is not binding on Wisconsin courts, it remains a stronger indication of Wisconsin law than prior decisions from this district attempting to divine how a Wisconsin court would rule.

Manufacturers Association – not GS1 Global. (Second Am. Compl. ¶ 93). Thus, the court may ignore this second assertion because it is based on a parent-subsidiary theory of agency. Edgenet also argues continuing business relationships in that Edgenet has been a certified data pool provider for GS1 Global and that, as such, it has paid fees to GS1 GDSN. Again, the court may ignore the payment of fees to GS1 GDSN. The remainder of Edgenet's argument focuses on the activity of GS1 Global's subsidiaries and can likewise be ignored.

As to the GSMP, while GS1 Global does in fact participate in the GSMP by responding to the messages and input of participants, the process occurs through an open forum on its website that participants choose to engage in. To the extent GS1 Global's exchange of electronic messages regarding a standards-setting process establishes contacts approximating presence in Wisconsin, that participation would seem to likewise establish the equivalent of presence in any forum in which a company voluntarily chooses to participate in the GSMP. That cannot be the proper intent of the Wisconsin long-arm statute, and, even if it were, it would not satisfy due process.[6] GS1 Global establishes standards for a system that companies voluntarily choose to participate in. In an effort to improve the standards it has established, GS1 Global has passively made its website an area in which companies may choose to engage and participate in the refining and further

---

[6]In fact, the court is skeptical that contacts occurring by means of a website are sufficient *additional* contacts to support the exercise of jurisdiction when combined with the existence and accessibility of the website itself. However, it need not decide such, as it finds the contacts insufficient even when considered.

development of these standards.  It is only after a given company, potentially located anywhere in the world, has actively reached out and made contact with GS1 Global through its website that GS1 Global then responds.  The nature and quality of this act is not so much GS1 Global making contact with the forum state as it is companies within the forum state making contact with GS1 Global.  GS1 Global's status as the overall administrator of the GDSN does not change this analysis.

Edgenet attempts to paint itself as acting as a data pool provider on behalf of GS1 Global, but the reality is that GS1 Global offers a standardized system of exchanging information that companies are free to avail themselves of, but when they do, they do so for their own business purposes, not for the benefit of GS1 Global.  In this way, the general availability of the GDSN and GSMP are unlike the availability of a product for purchase.  Further, when a company does avail itself of the use of the GDSN, it deals with GS1 Global's subsidiaries.  The fact that Edgenet and other Wisconsin companies use the GDSN establishes no more continuous and systematic contact with Wisconsin by GS1 Global than does a Wisconsin-based website developer's use of the coding standards developed by the World Wide Web Consortium in building a website.  Neither of these forms of contact suggest that GS1 Global has solicited, created, or maintained business relationships in Wisconsin.  In sum, the nature and quality of GS1 Global's direct contacts are not sufficient to approximate physical presence in a way that suggests GS1 Global

should be subject to jurisdiction for any cause of action, regardless of its relation to these contacts. Thus, GS1 Global is not subject to general jurisdiction in Wisconsin.

## II. SPECIFIC JURISDICTION

Edgenet has also failed to establish that Wisconsin's long-arm statute permits specific jurisdiction over GS1 Global and, in any event, the exercise of such would violate due process. Wisconsin statute permits the exercise of specific jurisdiction in a number of situations, including where there is an injury within Wisconsin by means of an out-of-state act so long as, at the time of injury, "[s]olicitation or service activities were carried on within [Wisconsin] by or on behalf of the defendant." Wis. Stat. § 801.05(4)(a). Additionally, specific jurisdiction is also proper where the action "[a]rises out of . . . services actually performed for the defendant by the plaintiff within [Wisconsin] if such performance within [Wisconsin] was authorized or ratified by the defendant." Wis. Stat. § 801.05(5)(b). Further, as with general jurisdiction, the exercise of specific jurisdiction must comport with due process. *uBID*, 623 F.3d at 426. The court discusses each statutory argument for jurisdiction in turn, followed by a discussion of due process.

### A. Solicitation Within Wisconsin

Edgenet is not able to establish that GS1 Global undertook solicitation or service activities in Wisconsin, or that such were performed on its behalf. The long-arm statute creates personal jurisdiction where there is an injury within Wisconsin by means of an out-of-state act so long as, at the time of injury, "[s]olicitation or

service activities were carried on within [Wisconsin] by or on behalf of the defendant." Wis. Stat. § 801.05(4)(a).  The Wisconsin Supreme Court has stated that while a single tortious act may be sufficient to permit the exercise of jurisdiction in accord with due process, this subsection "require[s] an additional contact." *Fields v. Peyer*, 250 N.W.2d 311, 315 (Wis. 1977).  The court further explained that the rationale of the solicitation element is that "where a defendant solicits or advertises for business, he anticipates a direct or indirect financial benefit and subjects himself to the jurisdiction of the courts of the state in which he advertises." *Id.* at 316.  As the Western District of Wisconsin has noted, the "solicitation" term has generally been equated with advertising, promoting, or selling products or services.  *Fried v. Surrey Vacation Resorts, Inc.*, No. 08-CV-534, 2009 WL 585964, at *3 (W.D. Wis. Mar. 6, 2009).  GS1 Global disputes only the occurrence of solicitation or service activities.  As is evident from the text of the provision, either direct activities or activities performed on behalf of the defendant may suffice.  Edgenet argues both.

### 1.    Direct Activities

First, Edgenet argues that GS1 Global engaged in the requisite solicitation or service activities by operating its interactive website, soliciting new and amended rules through the GSMP, and developing and administering the GDSN.  Edgenet's reference to the operation of the website seems primarily tied to the GSMP and the administration of the GDSN, as these are the primary interactive elements Edgenet

has repeatedly discussed. The existence of the website in and of itself is not specifically a solicitation or service activity conducted in Wisconsin.

Neither is the ability to participate in the GSMP a solicitation or service activity conducted in Wisconsin. Given the interpretation of "solicitation" as being business-related, it would make little sense for the term "service" to have no business-related meaning. GS1 Global's responses via its website to input volunteered by companies around the world are not service activities. GS1 Global is in no way obligated to make these responses and they do not provide participating companies with a benefit other than potentially better-crafted standards sometime in the future. Moreover, participants are not entitled to the potentially improved standards by virtue of participation in the GSMP; they still must pay fees to use the GDSN. It would be too strained a reading of the statute to characterize GS1 Global's responses to internet messages, part of a voluntary, collaborative standards-setting process, as a service provided by it to each individual Wisconsin company that chooses to participate in the GSMP.

GS1 Global's role in the GSMP cannot be properly characterized as solicitation either. While GS1 Global, through the existence of the Community Room as a method for participating in the GSMP, may passively "invite" the participation of GDSN users from around the world, the court does not find this sufficiently analogous to the active solicitation through advertising or other direct contact undertaken within Wisconsin to satisfy the statute. Further, this "solicitation" does

not anticipate financial benefit for GS1 Global because, even after rules developed through the GSMP are implemented in the GDSN, it is GS1 GDSN to whom companies pay subscription fees in order to participate in the GDSN.  In sum, the availability of the GSMP through GS1 Global's website is not conduct actively requesting or seeking the participation of Wisconsin residents with the anticipation of financial benefit.

Edgenet's argument with regard to GS1 Global's development and general administration of the GDSN similarly fails.  To be clear, while Edgenet uses the term "administration" in its arguments, it appears to actually refer to the fact that GS1 Global controls the standards used in the GDSN in an overarching manner.  The daily operation of the GDSN is in fact controlled directly by GS1 GDSN.  With that cleared up, the development and general administration of the GDSN is not itself a service carried out in Wisconsin because GS1 Global is not performing the acts for the benefit of any Wisconsin resident.  Instead, GS1 Global has independently developed a system that companies may choose to use, but until any actual use of the GDSN occurs, the overall development and administration of the network is no more a service than is the research, design, and manufacture of a product that a company hopes to later sell.  Moreover, Edgenet and others in Wisconsin may make use of the GDSN within Wisconsin, but GS1 Global's activities in developing and administering the network do not occur in Wisconsin.  To the extent that access to

and the ability to use the GDSN is itself a service, that is controlled by GS1 GDSN, not GS1 Global.

Edgenet makes little argument that development and overarching control of the GDSN is a form of solicitation other than in its original brief (Docket #19) in which it argues that GS1 Global's website contains information about how to join the GDSN and provides a link to an application site. The cited evidence (Rudolph Decl. ¶ 29 & Ex. 12), however, reflects at most a passive referral to separate entities that actually enable a company to join the GDSN. Nothing about the links on GS1 Global's website suggest direct solicitation within Wisconsin. As such, Edgenet has not sufficiently shown that GS1 Global has directly carried on solicitation or service activities within Wisconsin.

### 2. Activities On Behalf of GS1 Global

Next, Edgenet argues that the activities of GS1 GDSN and GS1 U.S. may be imputed to GS1 Global, that is, they have carried out solicitation or service activities in Wisconsin on behalf of GS1 Global. Wisconsin has equated the "on behalf of" language with the existence of an agency relationship. *Pavlic v. Woodrum*, 486 N.W.2d 533, 535 (Wis. App. 1992); *see also Stauffacher v. Bennett*, 969 F.2d 455, 458 (7th Cir. 1992); *Schimpf v. Gerald, Inc.*, 2 F. Supp. 2d 1150, 1162-63 (E.D. Wis. 1998); *Insolia v. Philip Morris, Inc.*, 31 F. Supp. 2d 660, 671-72 (W.D. Wis. 1998). The requisite agency exists where the defendant manifests to the agent that they may act on the defendant's account. *Pavlic*, 486 N.W.2d at 535. Alternatively,

apparent authority to act may exist where a third party reasonably believes the defendant consented to have the act done on its behalf by the apparent agent. *Id.* More specifically, apparent authority exists upon establishing: (1) acts by the agent or defendant justifying a belief in the agency; (2) knowledge of the acts by the defendant; and (3) reasonable reliance on the existence of the relationship by the plaintiff. *Insolia*, 31 F. Supp. 2d at 671. However, "[b]y itself, the mere existence of a parent-subsidiary relationship is insufficient to establish that a principal-agent relationship exists between the two entities." *Id.* What's more, the requirement that the defendant anticipate a financial benefit remains intact. *See Schimpf*, 2 F. Supp. 2d at 1162-63 (holding solicitation on behalf of defendant existed where agent solicited money for investment with defendant).

Edgenet offers the following in order to establish an agency relationship between GS1 Global and GS1 GDSN: (1) authority granted to GS1 GDSN to enter participation agreements with GDSN users, conferring the right to use the GDSN; (2) entrustment of the maintenance and operation of the Global Registry to GS1 GDSN for which GS1 Global exercises some policy making authority over; (3) GS1 Global has informed GS1 GDSN not to undertake policies or actions unless ratified by GS1 Global; and (4) GS1 Global plans to eliminate or reduce GS1 GDSN's role in GDSN activities. It also asserts that GS1 U.S. is an agent because it is the sole source of company prefixes in the U.S. However, because the court finds the financial benefit requirement lacking, the actions of GS1 GDSN and GS1 U.S.

cannot be considered solicitation or service activities on behalf of GS1 Global. Edgenet glosses over the requirement, briefly asserting that GS1 Global benefits from the activities of both alleged agents and citing as an example the fact that GDSN users who execute participation agreements with GS1 GDSN must join a data pool to whom the user pays a fee, and the data pool in turn pays subscription fees to GS1 GDSN. This is clearly a financial benefit to GS1 GDSN, but it does not evidence a financial benefit to GS1 Global. The fact that a corporation's subsidiary financially benefits cannot satisfy the requirement as to the parent. The purpose of allowing jurisdiction on the basis of acts by an agent is to avoid allowing a defendant to escape jurisdiction by indirectly performing activities that would normally permit jurisdiction. Because direct solicitation or service activities must be done in anticipation of financial benefit to the defendant, it follows that such activities performed on behalf of the defendant must similarly be done in anticipation of financial benefit *to the defendant*.[7] If there is no financial benefit to the defendant, then the activity is not truly being performed on behalf of the defendant. For example, it would make little sense to impute the activities of an "agent" to the defendant on the theory that the defendant authorized, or apparently authorized, the "agent" to conduct its own affairs. The only way to read the fees ultimately being paid to GS1 GDSN as a financial benefit to GS1 Global is to impermissibly assume such on the basis of the parent-subsidiary relationship. Not only is this improper, but

---

[7]This is not to say that the agent may not simultaneously derive its own financial benefit from the activity.

in this case may not even be accurate. As Edgenet itself has pointed out, GS1 Global has had to *loan* money to GS1 GDSN to cover shortfalls in revenue. This tends to show separate accounting practices. As to GS1 U.S., that organization is not even alleged to be a subsidiary of GS1 Global. Edgenet has likewise shown nothing to suggest that GS1 U.S.'s activities financially benefit GS1 Global. Thus, Edgenet's argument fails for a lack of financial benefit to GS1 Global.

In fact, a lack of financial benefit to GS1 Global seems to undermine the claim of agency itself. Imputation of a solicitation or service activity performed by a subsidiary that only financially benefits the subsidiary does little more than obscure the fact that activity is essentially being imputed on the basis of the parent-subsidiary relationship alone. That relationship is not sufficient to permit jurisdiction. In sum, Edgenet has not shown that GS1 GDSN or GS1 U.S. performed solicitation or service activities in Wisconsin on behalf of GS1 Global.

### B.    Services Performed by Edgenet for GS1 Global

GS1 Global is likewise not subject to jurisdiction under § 801.05(5)(b). Wisconsin permits the exercise of jurisdiction where the action "[a]rises out of . . . services actually performed for the defendant by the plaintiff within [Wisconsin] if such performance within [Wisconsin] was authorized or ratified by the defendant." Wis. Stat. § 801.05(5)(b). With regard to the services required, the Wisconsin Supreme Court has cited the revision notes for subsection (5) to explain that:

> Three jurisdictional facts are required by this subsection: (I) a claim arising out of a bargaining arrangement made with the defendant by or on behalf of the plaintiff; (ii) a promise or other act of the defendant, made or performed anywhere, which evidences the bargaining arrangement sued upon; and (iii) a showing that the arrangement itself involves or contemplates some substantial connection with the state. . . . In summary[,] actions arising out of isolated bargaining transactions have been regarded as supporting the exercise of personal jurisdiction in numerous situations where the transactions involved, or contemplated, some substantial contact with the forum state.

*Flambeau Plastics, Corp. v. King Bee Mfg. Co.*, 129 N.W.2d 237, 240-41 (Wis. 1964), *overruled in part on other grounds by* 131 N.W.2d 331 (Wis. 1964); *see also Pavalon v. Fishman*, 140 N.W.2d 263, 265 (Wis. 1966) (quoting the three jurisdictional facts from the revision notes and citing *Flambeau*). Wisconsin cases applying subsection (5)(b) tend to involve services in the sense of contractual or other business-related performance. *E.g. Regal Ware, Inc. v. TSCO Corp.*, 558 N.W.2d 679, 681-82 (Wis. App. 1996); *Landreman v. Martin*, 530 N.W.2d 62, 66 (Wis. App. 1995); *Brown v. LaChance*, 477 N.W.2d 296, 303 (Wis. App. 1991). Edgenet argues two methods of performing services for GS1 Global: (1) Edgenet's operation as a GS1-certified data pool provider; and (2) Edgenet's participation in the GSMP.

Edgenet's operation of a certified data pool does not constitute a service performed for the benefit of GS1 Global. While GS1 Global indeed develops and even likely encourages adoption of a standardized system for exchanging supply chain information, Edgenet operates as a certified data pool provider in order to

profit, not to benefit GS1 Global. Edgenet performs its data pool services on behalf of the companies that use its data pool; GS1 Global, at best, indirectly benefits in the sense that its standards have been adopted. In fact, the structure of Edgenet's complaint illustrates this point. The general theme of Edgenet's allegations have been that the defendants purposely misappropriated and misused Edgenet's material, which is offered and incorporated into its data pool services in addition to the standards administered by GS1 Global. Edgenet has pointed out that this misappropriated material provides it with a leg up in the competition against defendant 1Sync, Inc., a data pool provider which is a subsidiary of GS1 U.S., a member organization of GS1 Global. Thus, Edgenet's own complaint paints a picture of data pool services provided, albeit indirectly, in competition with GS1 Global rather than for its benefit. Thus, operation of a certified data pool is insufficient to satisfy subsection (5)(b).

Likewise, Edgenet's participation in the GSMP does not constitute a service performed for GS1 Global's benefit. A review of cases in which Wisconsin courts have applied subsection (5)(b), as well as the explanation in the revision notes, show that the type of action taken by Edgenet here is not properly a service within the meaning of the statute. Here, Edgenet has shown only that users of the GDSN are permitted to access a specific portion of GS1 Global's website and participate in a process to improve standards. While GS1 Global may benefit in an abstract way from the participation of companies in strengthening the standards it administers,

there is no evidence that GS1 Global has entered bargaining arrangements with each company contemplating some type of service agreement. GS1 Global is free to adopt or ignore suggestions or other input given by companies participating in the GSMP, just as GDSN users are in no way compelled to participate in the GSMP. Further, there is no showing that the communications that occur through the GSMP in any way show that GS1 Global has entered individual arrangements with each participant that contemplate a substantial connection with the company's given state. It is clear that subdivision (5)(b) does not cover participation in the GSMP. In sum, § 801.05(5)(b) does not permit the exercise of jurisdiction under these facts.

### C.    Due Process

As a final matter, even if these activities were sufficient under Wisconsin's long-arm statute, the exercise of specific jurisdiction here would violate due process. In order to satisfy due process, the defendant must have: (1) purposefully directed the activity at the forum state or purposefully availed itself of the privilege of conducting business therein; (2) the injury must arise out of the forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice. *Tamburo*, 601 F.3d at 702. More specifically, purposeful direction can be broken into three elements: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt – that is, the plaintiff would be injured – in the forum state." *Id.* at 703. The Seventh Circuit drew these

requirements from *Calder v. Jones*, in which the Supreme Court held that personal jurisdiction in California existed over both a reporter for, and the president and editor of, the National Enquirer, both of whom resided in Florida. *Calder v. Jones*, 465 U.S. 783 (1984). Before recounting the Seventh Circuit's treatment of *Calder*, it is first worth relaying what the Supreme Court itself said in that case:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of the respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California.

*Id.* at 788-89. The Seventh Circuit noted that *Calder*'s "express aiming" requirement has been read both broadly, to require only conduct targeted at a plaintiff known to be a resident of the forum state, and narrowly, to require the state be the "focal point" of the conduct. *Tamburo*, 601 F.3d at 704. In fact, the *Tamburo* court noted that the circuit's own prior decisions appeared to be in tension on this point. *Id.* In one, the Seventh Circuit held jurisdiction was not proper in Indiana for malicious prosecution where that conduct occurred solely in California, despite the fact that the plaintiff resided in Indiana and was thus harmed there. *Wallace v. Herron*, 778 F.2d 391, 395 (7th Cir. 1985). In *Wallace*, the Seventh Circuit decided that *Calder* did not alter the requirement that jurisdictionally sufficient conduct must create a "substantial

connection" with the forum. 778 F.2d at 395; *Tamburo*, 601 F.3d at 705 (citing *Wallace*).

In the other relevant case, the Seventh Circuit stated that "there can be no serious doubt after [*Calder*] that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor." *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997). The *Tamburo* court also discussed a case relied on in *Janmark*, wherein the National Football League's Indianapolis Colts sued the Canadian Football League's Baltimore Colts in Indiana for copyright infringement. *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410 (7th Cir. 1994). In *Indianapolis Colts*, the court found jurisdiction proper on the basis of the injury occurring in Indianapolis, as well as "entry" into Indiana by the Baltimore Colts on the basis of cable-television broadcasts of their games in Indiana. *Id.* at 412. Without deciding whether "entry" into the state, in addition to the injury, was required, the *Indianapolis Colts* court noted that:

> In *Calder* as in all the other cases that have come to our attention in which jurisdiction over a suit involving intellectual property (when broadly defined to include reputation, so that it includes *Calder* itself) was upheld, the defendant had done more than brought about an injury to an interest located in a particular state.

*Id.*

Analyzing all three cases, the *Tamburo* court wrote that it would be hard to reconcile *Janmark* with the other two cases if it was understood to broadly authorize jurisdiction wherever injury occurred. *Tamburo*, 601 F.3d at 705. The court,

however, read further into *Janmark*, recognizing that, despite some of its broad language, it ultimately focused on more than just the location of injury and "considered the relationship between the allegedly tortious conduct and the forum state itself." *Id.* at 706. However, the Seventh Circuit once again found it unnecessary to definitively decide the breadth of *Calder* because it found both a forum-state injury as well as the tortious conduct having been specifically directed at the forum, "making the forum state the focal point of the tort." *Id.* In *Tamburo*, an Illinois resident brought suit against residents of Canada, Colorado, Michigan, Ohio, and Australia for actions taken accusing the plaintiff of stealing their data and urging boycott of the plaintiff's software products. *Id.* at 697. These activities took place through "blast" emails and posts on the defendants' websites. *Id.*[8] The messages variously encouraged readers to boycott the plaintiff's products, as well as to contact and harass the plaintiff. *Id.* at 706. The defendants also contacted the plaintiff directly, accusing him of theft and demanding removal of stolen data, as well as threatening to expose the theft to the online community. *Id.* The court found jurisdiction over the Canadian, Coloradan, Michigander, and Ohioan, citing to a Tenth Circuit case for further support, and writing that "the individual defendants purposely targeted [the plaintiff] and his business in Illinois with the express goal of inflicting commercial and reputational harm on him there, even though their alleged

---

[8] The plaintiff also alleged that the Australian defendant reposted messages to a private email listserv, but the court found a lack of personal jurisdiction over the Australian defendant for a whole host of reasons primarily involving a lack of detail in the complaint, making that aspect less applicable here. *See id.* at 708.

defamatory and otherwise tortious statements were circulated more diffusely across the Internet." *Id.* at 707.

Here, Edgenet has alleged that the defendants posted proprietary material on GS1 Global's website, which is alleged to constitute copyright infringement as well as misappropriation of trade secrets. But, even if the complaint is read liberally enough to conclude that GS1 Global's conduct can be characterized as having posted the material,[9] it is not sufficient to show that the conduct was purposefully directed at Wisconsin. Looking to whether GS1 Global expressly aimed the posting of the material at Wisconsin, there is little doubt that Edgenet allegedly suffered an injury in the state. However, the court reads *Calder*, through the lens of *Tamburo*, to require more than the alleged victim's presence in a given state. Instead, the court must ensure that Wisconsin was the "focal point" of the activity, here the posting of the allegedly misappropriated materials. Based upon the submitted affidavits and the complaint, that is not the case. Posting of the material on GS1 Global's website made it generally available to companies located anywhere in the world. The posted material was not, for example, solely or primarily of use only to

---

[9]It is questionable the complaint can even be read in such a way. Though Edgenet asserts in its brief that GS1 Global intentionally posted the material on its website, the complaint itself suggests only that defendants GS1 U.S., 1Sync, Inc., and American Hardware Manufacturers Association obtained the proprietary information, created derivative works, and posted it to GS1 Global's website. (Second Am. Compl. ¶¶ 75-94). At the end of Edgenet's recitation of improper conduct, it adds a one-paragraph allegation that GS1 Global "supervised, facilitated, approved, and has been unjustly enriched" by the activity of the other three defendants. (Second Am. Compl. ¶ 95). While this is not meant as a comment on whether GS1 Global can be held liable for copyright infringement or misappropriation of trade secrets, it would bear on whether GS1 Global's activity was directed at Wisconsin. However, the court finds it unnecessary to make the determination.

competitors or companies in Wisconsin, nor is there anything else to suggest that the posting of this material was done to explicitly reach Wisconsin. The only connection with Wisconsin apparent from the submitted materials is Edgenet's presence in the state.

*Indianapolis Colts* provides a useful comparison by looking at the difference between posting materials to a generally accessible website versus entry into a state by means of television broadcasts. In *Indianapolis Colts*, the defendant entered Indiana by means of broadcasts because each broadcast specifically communicated the infringing trademark to residents of the forum state. While broadcast deals can certainly be national in scope, that national character (or even hypothetically world-wide or nearly world-wide character) is not analogous to the passive world-wide reach of a website. A broadcast deal is established to target a specific market, often for a variety of reasons (such as advertising revenue), and it is a calculated decision made in an attempt to reach that forum. Thus, even though a nation-wide broadcast makes the conduct much more generally available, the deal is done with the intent of reaching into each given state. A website, however, is accessible world-wide by its inherent nature.[10] There is no particularized decision to enter each forum that has access to the internet; there is only a decision to create a presence on the internet. Thus, similar to how the existence of a website alone cannot support general jurisdiction, a website cannot be viewed as a purposeful entry into each and every

---

[10]With certain exceptions, such as censorship or other blocking that may be performed by particular governments or other entities that have the ability to control internet traffic.

forum in the world. Instead, something about the conduct occurring on the website must indicate it was purposefully directed at the forum. That is lacking here. To reiterate, nothing about the simple posting of allegedly infringing material, beyond the location of the victim, indicates that the action was focused on Wisconsin. That is not enough to make the state the focal point of GS1 Global's activity and, therefore, Edgenet has failed to show that GS1 Global purposefully directed its conduct toward Wisconsin.[11] Thus, the exercise of specific jurisdiction under these circumstances would violate due process.

## III.    CONCLUSION

At the end of the day, Edgenet has failed to establish that either general or specific personal jurisdiction over GS1 Global is proper in Wisconsin. GS1 Global's contacts with Wisconsin are not of sufficient nature and quality to approximate presence in such a way as to subject it to jurisdiction for any cause of action. Further, Edgenet has not shown that GS1 Global has directly carried out solicitation or service activities in the state, or that such have been carried out on its behalf. Edgenet also does not satisfy the provision permitting jurisdiction where a plaintiff performs services in the state on behalf of the defendant. Moreover, even if any of these specific-jurisdiction provisions were satisfied, the exercise of specific jurisdiction would not comport with due process. Thus, the court will grant GS1 Global's motion to dismiss.

---

[11]Neither has Edgenet made an argument for purposeful availment, and it would not succeed in any event, as reasoned with regard to Wisconsin's long-arm statute.

Accordingly,

**IT IS ORDERED** that defendant GS1 AISBL's Motion to Dismiss for Lack of Jurisdiction (Docket #87) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Counts Six and Seven of the Second Amended Complaint (Docket #43) as against defendant GS1 AISBL be and the same are hereby **DISMISSED for want of personal jurisdiction**.

Dated at Milwaukee, Wisconsin, this 27th day of June, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge